604 F.2d 1261
 102 L.R.R.M. (BNA) 2608, 87 Lab.Cas. P 11,589
 Leslie D. AITKEN, Plaintiff-Appellant,
v.
IP & GCU-EMPLOYER RETIREMENT FUND, the Retirement Fund
Committee of the IP& GCU-Employer Retirement Fund,
Daniel Johnston and James Smock,
Defendants-Appellees.
 No. 77-1437.
 United States Court of Appeals,
Ninth Circuit.
 Sept. 27, 1979.
 
 Richard P. Donaldson, Donaldson & Kiel, P. S., Seattle, Wash., on brief, for plaintiff-appellant.
 Leslie D. Aitken, in pro per.
 Appeal from the United States District Court for the Northern District of California.
 Before MOORE,* SNEED, and KENNEDY, Circuit Judges.
 KENNEDY, Circuit Judge:
 
 
 1
 This action involves a claim by a labor union member for pension benefits and damages resulting from an alleged breach, by a pension fund and its administrators, of contract obligations, fiduciary duties, and other duties implied by the law of torts. The issue is whether the member is eligible to participate in the retirement plan, and if not, whether he can in any event recover damages from any of the defendants. Suit was commenced in state court, and the defendants removed it to the United States District Court for the Northern District of California. After cross motions for summary judgment, the district court granted summary judgment for the defendants on December 2, 1976. This appeal followed.
 
 
 2
 The defendants below, appellees here, are the International Printing & Graphic Communications Union, the Employer Retirement Fund (Retirement Fund or Fund), the Fund Committee, which is the trustee of the Fund, Daniel Johnston, the Administrator of the Fund, and James Smock, Johnston's Administrative Assistant. The Fund was created in 1955. It was established and has been maintained in accordance with section 302(c)(5) of the Taft-Hartley Act, 29 U.S.C. § 186(c)(5), and Internal Revenue Code § 401(a). There are about 1900 newspaper, commercial printing and paper products employers who are parties to collective bargaining agreements with about 275 local unions. The employers currently contribute to the Fund on behalf of some 47,500 employees. At least 7,900 retired employees are now receiving or have previously received retirement benefits from the Fund.
 
 
 3
 The plaintiff below, appellant here, is Leslie D. Aitken. Aitken is a printer who has operated two successive businesses, both as sole proprietorships. Aitken operated Art Craft Press in California from 1946 until sometime in 1963. In 1963 plaintiff purchased and began operating Packard for Printing. Both concerns were operated For a short time, but then plaintiff devoted all his attentions to Packard For Printing, which he operated exclusively until his retirement in January 1973. In the early years Aitken had some employees under his supervision from time to time, but from 1968 to 1973 he was the sole printer in his proprietary shop.
 
 
 4
 Although he owned his own business, Aitken remained a dues paying member of Oakland Printing Pressmen and Assistants' Union Local 125, and later with Western Graphic Art Union Local 14. This entitled him to put the union symbol on his printing products and to fill union printing orders. Art Craft, and later Packard, were parties to various collective bargaining agreements with Local 125 and Local 14.
 
 
 5
 The bargaining between Art Craft Press and Local 125 produced an agreement by Art Craft Press to contribute to the retirement fund. The retirement fund administrative office received a copy of the collective bargaining agreement, which was signed for Art Craft Press by Aitken as "employer" and showed Art Craft Press as the company. The status of the business as a sole proprietorship was not indicated. Upon receipt of the agreement the fund sent Art Craft Press various materials, including employer report forms, employee enrollment cards, and copies of the full text of the "Retirement Benefit Plan" and a "Trust Agreement" governing operation of the fund.
 
 
 6
 Aitken enrolled himself in the fund and transmitted a contribution report form. The report listed Aitken as an employee of Art Craft Press, showed the number of shifts he worked, and was accompanied by employer payments checks signed by the plaintiff. Subsequent contribution report forms were filed for some later periods. There are allegations that during the brief period when Aitken had two companies, the Administrative Office of the Fund inquired of Fred Brooks, Secretary-Treasurer of Local 125, whether the two companies had merged; that Brooks knew Aitken was a sole proprietor; and that he wrote a letter to the Fund putting them on notice of this fact. The defendants deny Brooks notified the Fund of Aitken's status.
 
 
 7
 In August of 1970, apparently following the merger of Local 125 into Local 14, plaintiff signed another pension contributing agreement. Plaintiff signed the documents, filled in the name "Packard For Printing" over the "company" line, wrote "owner" over the "title" line on each form, and checked the "sole proprietor" box on the pension contributing agreement. Plaintiff mailed copies to the Administrative Office of the Fund, although the appellees deny having received the agreement. Beginning in 1971 and continuing through 1973, the Fund's monthly reports, which were used by Packard For Printing, contained the statement "sole owners or partners are not considered employees and may not participate."
 
 
 8
 Plaintiff applied for retirement benefits in December of 1972, indicating that he would retire in January of 1973. For the first time, the Fund began to make a determination of plaintiff's eligibility to participate in the Fund. It is the Fund's practice not to determine eligibility until the employee applies for retirement benefits. Aitken's application was processed and payment of benefits was approved. Plaintiff received benefits from February through August of 1973.
 
 
 9
 After further review of the documents submitted by plaintiff to the Fund, it was determined that plaintiff was a sole proprietor and as such ineligible to participate in the Fund. On August 22, 1973, a Fund agent directed the nominal trustee of the Fund to stop paying benefits to plaintiff.
 
 
 10
 Plaintiff asks either that the Fund be ordered to pay him retirement benefits in accordance with the provisions of the Retirement Plan, or that he be awarded compensatory, and in some instances, punitive damages. He advances seven grounds for relief: breach of the Retirement Plan contract; estoppel prohibiting the fund from denying his eligibility; breach of fiduciary duties; fraud; breach of a covenant of good faith and fair dealing; waiver of plaintiff's ineligibility; and intentional infliction of mental distress.
 
 Applicable Law
 
 11
 Initially, we must decide whether federal or state law governs plaintiff's claims. We conclude that federal law governs both the contract and estoppel claims. Interpreting a pension plan agreement permitted under 29 U.S.C. § 186, and determining whether a breach of that agreement has occurred, is a matter controlled by federal law. Rehmar v. Smith, 555 F.2d 1362, 1366-72 (9th Cir. 1976). Similarly, in this circuit the existence of an estoppel in suits against pension funds created under 22 U.S.C. § 186 is a matter of federal common law. Thurber v. Teamsters Pension Plan, 542 F.2d 1106 (9th Cir. 1976).
 
 
 12
 As to the remainder of Aitken's theories, the parties agree that liability questions are determined according to California law.
 
 Breach of Contract
 
 13
 The Retirement Benefit Plan (Plan) gives the Fund Committee broad authority over questions of eligibility. The Plan provides that the Committee has the authority
 
 
 14
 To construe the provisions of the Trust and Plan, and to reconcile and correct any errors made in the administration of the Plan . . . (and also the authority) to determine all questions of eligibility for participation in the Plan, eligibility for retirement, credited service, amount of benefits payable, and all other questions which may arise in connection with the application and operation of the Plan, and to afford any Participant dissatisfied with any of such determinations the right to a hearing thereon.
 
 
 15
 Plan, Article V, § 5(c), (f). When the administrators of a labor-management fund have been given this authority to construe the agreement, their interpretations will not be overturned unless they are (1) arbitrary and capricious, (2) not supported by substantial evidence, or (3) erroneous on a question of law. Rehmar v. Smith, supra, 555 F.2d at 1371; Beam v. Masters, Mates and Pilots, 511 F.2d 975 (2d Cir. 1975). We conclude that the Committee's interpretation of the Plan is reasonable.
 
 
 16
 Not everyone who pays money to the Fund thereby becomes eligible to receive benefits. Rather, the Plan provides that "Benefits shall be payable only to 'participants' who retire under the Plan and who meet the eligibility requirements thereunder. No benefits shall be payable to any other participant." "Participant" is defined as "any employee who is eligible for participation in the plan." "Employee" is defined to mean
 
 
 17
 any person employed by any (employer) working under a collective bargaining agreement between the Employer and the Union, employees of other contributors as defined in Article III and such other persons as may be eligible to participate in the Plan as set forth herein.
 
 
 18
 The employees who are eligible to participate in the Plan are described in Article III.[1]
 
 
 19
 The language relied on by Aitken states that those eligible to participate include "Participants who submit payments in accordance with any permissible provisions of this retirement plan." Article IV, which describes how payments should be made to the Fund, also states: "3. Contributions from other contributors shall be made in a like manner to those under No. 2 above (contribution by employers) and as prescribed by the Committee from time to time." Appellees insist that direct payments from employees have never been allowed.
 
 
 20
 We think the parties to the agreement at least intended that benefits be paid only to eligible "employees"; and appellees contend that sole proprietors are not "employees" under the agreement. They argue that a contrary interpretation would require them to violate the requirements of section 302 of the Taft-Hartley Act and also eliminate their tax status as "qualified trusts" under I.R.C. § 401(a). Appellees cite several cases to the effect that owners, partners, supervisors, and sole proprietors may be denied retirement benefits under section 302 plans designed for the exclusive benefits of "employees." Gomez v. Lewis, 414 F.2d 1312 (3d Cir. 1969); Warren v. Davis, 95 L.R.R.M. 2025 (E.D.Okla.1977); Melang v. I. B. E. W. Pac. Coast Pension Fund, 93 L.R.R.M. 2389 (W.D.Wash.1976); Mendise v. Central States, S. E. & S. E. Areas Pension Plan, 90 L.R.R.M. 3208 (N.D.Ohio 1975); Nelson v. Joyce, 404 F.Supp. 489 (E.D.Ill.1975); Miracle v. U. M. W. Welfare & Retirement Fund, 373 F.Supp. 603 (D.D.C.1974); Blofsen v. Cutaiar, 460 Pa. 411, 333 A.2d 841 (1975); Blinkhorn v. McCarthy, 113 R.I. 465, 322 A.2d 43 (1974); Ashbee v. Brunie, 19 A.D.2d 826, 243 N.Y.S.2d 593 (1964); Dohrer v. Wakeman, 14 Wash.App. 157, 539 P.2d 91 (1975); French v. Constr. Laborers Pension Trust, 44 Cal.App.3d 479, 118 Cal.Rptr. 731 (1975); Munts v. Fitzsimmons, 25 Ill.App.3d 109, 323 N.E.2d 153 (1975).
 
 
 21
 To uphold the decision of the Fund and its interpretation of the agreement we need not decide that to pay benefits to Aitken would be illegal. It is sufficient that appellees' interpretation of the eligibility provisions is reasonable. Defendants' legitimate concern about complying with the requirements of section 302 and I.R.C. § 401(a), together with the above cases, provides ample support for the conclusion that their interpretation is reasonable. It may be possible to argue that in certain contexts a sole proprietor can be considered an employee; it was reasonable to reach the opposite conclusion in this case. That the Committee's action in this case is not arbitrary is further supported by the fact that in the 31 instances from 1959-1974, when sole proprietors have been discovered participating in the Plan, the Committee's consistent practice has been to terminate the participation and refund the person's money, as it did with plaintiff in this case.
 
 
 22
 The language of the Plan agreement is not unambiguous. Nevertheless, Aitken knew that the Committee was given broad authority to determine eligibility and that not everyone who paid money into the Fund was automatically eligible. The agreement in question does not as a matter of law obligate appellants to pay retirement benefits to sole proprietors such as plaintiff who pay money into the Fund. The Committee's interpretation of the agreement was reasonable. Summary judgment on the contract claim in favor of appellees was proper, and we affirm the district court's ruling in this regard.
 
 Estoppel
 
 23
 In the district court the defendants stipulated, for summary judgment purposes, that they acquired knowledge of Aitken's sole proprietor status in 1963 (as a result of an inquiry letter to Fred Brooks) and again in August 1970, as a result of the information appearing on a new pension agreement, which Aitken signed as "owner" of Packard For Printing, and which indicated he was a sole proprietor. Aitken contends that this knowledge, combined with appellees' failure to inform him of his ineligibility, estops them from denying his eligibility. Aitken also argues that the language of the pension agreement was reasonably understood by him as a representation that he was eligible to participate. These contentions form the core of Aitken's arguments under the various tort theories advanced. Appellees contend that to require them by operation of estoppel to pay benefits to Aitken would be to require them to perform an illegal act, since Aitken is an "employer" and not an "employee."
 
 
 24
 In Thurber v. Western Conference of Teamsters Pension Plan, 542 F.2d 1106 (9th Cir. 1976), the court held that the federal law of estoppel may not be applied to compel a section 302 retirement pension fund to pay benefits to someone determined to be ineligible under the provisions of the plan agreement. Such payment, the court held, would violate section 302's requirements that payment by an employer to a section 302 trust fund be made only according to the terms of the written plan agreement ("(T)he detailed basis on which such payments are to be made (must be) specified in a written agreement with the employer"), and that such funds be "for the sole and exclusive benefit of (the) employees."
 
 
 25
 Thurber, the plaintiff, was an employee of an employer contributing on his behalf to a section 302 retirement trust. He worked for this employer for 22 years. For about three of those years he worked only part time, losing his union membership, and therefore was not covered under the terms of the pension agreement. When he rejoined the union, the employer again began making contributions on his behalf. An employee of the firm retained to administer the pension fund told him that if certain conditions were met and the employer made supplemental contributions covering the break period, the break in coverage would be harmless. Later he was advised by the same employee that the break in service had been "healed" and that he was eligible for early retirement benefits under the plan. After taking several steps in reliance on this representation, Thurber applied for early retirement benefits and was told he was not eligible.
 
 
 26
 The court first noted that "federal regulation of employee benefit trusts under § 302(c)(5)(B) was premised on the purpose of insuring that the trust funds were not tampered with or used for illicit purposes." 542 F.2d at 1108. It then endorsed Moglia v. Geoghegan, 403 F.2d 110 (2d Cir. 1968), Cert. denied, 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969), a case which held in part:
 
 
 27
 any payment made by an employer to an employee representative, and this includes trustees administering a pension trust fund . . . and the receipt of such payments by an employee representative are absolutely forbidden unless there is a written agreement between the employer and the union specifying the basis upon which the payments are made. . . . The reason for the rigid structure of Section 302 is to insure the employer contributions are only for a proper purpose and to insure that the benefits from the established fund reach only the proper parties.
 
 
 28
 Id. at 116. Turning to the case before it, the court said:In the instant case there was of course a written agreement. It did not, however, contain any provision authorizing the employer to make contributions for the purpose of "curing" or "healing" breaks in service. We agree with the district court that it was illegal for the Pension Fund to receive the retroactive contribution in an attempt to heal the break in service. It would likewise be illegal for the Fund to pay benefits to Thurber based upon the illegal retroactive contribution. The diversion of contributions made on behalf of covered employees outside the terms of the trust would contravene § 302's requirement that contributions to a trust fund must be made "for the sole and exclusive benefit of the employees of (the) employer, and their families and dependents".
 
 
 29
 The fact that Thurber relied on representations of an employee of the firm retained to administer the trust fund would not estop the Pension Fund and its trustees from denying Thurber's eligibility for the pension. The rights of other pensioners must be considered, and the trust fund may not be deflated because of the misrepresentation or misconduct of the Administrator of the fund. We agree with the district court that the doctrine of estoppel may not be invoked to compel an illegal act.
 
 
 30
 542 F.2d at 1109.
 
 
 31
 The holding of Thurber controls our disposition of the estoppel claim here. Thus, even assuming that plaintiff is an "employee" within the meaning of section 302(c)(5), the fund nevertheless could not by estoppel be required to pay benefits to plaintiff, since he was reasonably determined to be ineligible under the plan's provisions. Cf. Phillips v. Kennedy, 542 F.2d 52, 55 n.8 (8th Cir. 1976) ("The actuarial soundness of pension funds is, absent extraordinary circumstances, too important to permit trustees to obligate the fund to pay pensions to persons not entitled to them under the express terms of the pension plan.").
 
 
 32
 We recognize that our holding, by itself, seems to produce an unjust result in this case. Had the court in Thurber expressed the rationale of its holding less clearly, we might be inclined to attempt to confine both it and Moglia. There are several reasons for reaching a different result here than in the Thurber and Moglia cases. First, both the Thurber and Moglia courts agree that "federal regulation of employee benefit trusts under § 302(c)(5)(B) was premised on the purpose of insuring that the trust funds were not tampered with or used for illicit purposes." 542 F.2d at 1108. Strict regulation of payments by employers to employee representatives was deemed necessary by Congress to prevent corruption in the collective bargaining process. See Blassie v. Kroger Co., 345 F.2d 58, 67 (8th Cir. 1969); Arroyo v. United States, 359 U.S. 419, 425, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959); Moglia, supra, at 115-16. A judicial order to pay benefits in accordance with the provisions of a written agreement to a person who, although determined to be ineligible, has consistently had contributions paid on his behalf and in all other respects resembles eligible participants, seems to present little danger of corruption or undue influence. Perhaps the Moglia court recognized this when it expressly reserved the question decided in Thurber: "Whatever merit (plaintiff's estoppel argument) may have if directed to the appellee trustees' invocation of the terms of the trust agreement to deny appellant at this late date any pension benefits, a matter we need not decide, the equitable estoppel argument cannot supply the essential element of the written agreement Congress required by subsection 302(c)(5)(B)." 403 F.2d at 117. The statute itself recognizes that judicially compelled payments present little danger of corruption, See 29 U.S.C. § 186(c)(2).
 
 
 33
 Second, we note that where the remedy sought is payment of retirement benefits in accordance with the plan's provisions, and not payment of punitive damages, the concern expressed in Thurber, Phillips, and Moglia about jeopardizing the actuarial soundness of the fund seems misplaced ("The trust fund may not be deflated because of the misrepresentation or misconduct of the Administrator of the fund." 542 F.2d at 1109). In the instant case Aitken has made the required contributions. We perceive no substantial danger to the actuarial soundness of the defendant fund if they are required to pay retirement benefits to plaintiff in accordance with the terms of the retirement plan agreement. Aitken has always been listed as an "employee" in the Fund's records, and the actuarial calculations anticipated paying him a pension just as any other employee.[2] Plaintiff may end up receiving more in benefits from the Fund than the Fund has received as a result of his contributions, or he may receive less; this is the expected actuarial risk which the Pension Fund takes with all participants.
 
 
 34
 Finally, although some courts have reached a contrary result, See Dohrer v. Wakeman, supra; Melang v. I. B. E. W. Pac. Coast Pension Fund, supra; Kennet v. U. M. W., 183 F.Supp. 315, 318 (D.D.C.1960), and there are strong arguments on the other side, plaintiff's contention that a sole proprietor can be considered an "employee" as that word is used in section 302(c)(5) is not frivolous. The Supreme Court has indicated that the word "employee" in the LMRA may vary in scope depending on the policies of the specific LMRA section in question where inclusion or exclusion is not totally clear. See Allied Chemical Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971).[3]
 
 
 35
 Thus, absent Thurber, there are in theory arguments for holding that judicially compelled payments by retirement pension funds in accordance with the provisions of a detailed written agreement, which would not significantly affect the actuarial soundness of the fund, to a person who would be a proper participant but for the Fund's determination of ineligibility, respond to the policy considerations underlying section 302.[4] We do not, however, write on a clean slate. In light of Thurber, summary judgment as to plaintiff's estoppel claim was appropriate, and the district court's judgment on this question is affirmed.
 
 
 36
 The same federal policies underlying Thurber also mandate that plaintiff cannot sue the Fund to require it to pay pension benefits to him under the guise of "damages" based on various state theories. No provision in the written agreement was made either for receipt of plaintiff's contributions or for payment of benefits to plaintiff, and thus Thurber and the federal labor policies supporting the decision would be undermined by permitting such a claim. In terms of the labor policies supporting Thurber, we perceive no principled difference between the estoppel claim in Thurber and the various state law claims made by plaintiff here against the defendant Fund.
 
 Individual Liability
 
 37
 Our holding above is that plaintiff may not compel the defendant Fund to pay him retirement benefits under either the federal or state law theories advanced. To this extent summary judgment against plaintiff was proper.
 
 
 38
 Thurber did recognize the possibility of individual recovery against the administrator and other trustees, in this case the Fund Committee and Administrators Johnston and Smock. See 542 F.2d at 1109 nn.4 & 5. See also Phillips v. Kennedy, supra, at 55 n.8. We think it possible that, if the allegations in plaintiff's complaint are construed favorably, plaintiff has stated a claim for relief against the Fund Committee members and administrators.[5] We are unable to determine, however, whether the district court considered such theories or why they were rejected if considered. We remand this case to the district court for further consideration of this aspect of plaintiff's claims.
 
 
 39
 Neither the Thurber court nor the Phillips court described in detail the basis of suits against the individual trustees. Prior to passage of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 Et seq., regulation of many aspects of a section 302 pension fund was governed by state law. The laws of California impose a fiduciary obligation on members of the Committee. See, e. g., Lix v. Edwards, 82 Cal.App.3d 573, 147 Cal.Rptr. 294, 298-99 (1978) ("(Pension plans) create a trust relationship between pensioners-beneficiaries and the trustees of pension funds who administer retirement benefits. The trustees must exercise their fiduciary trust in good faith and must deal fairly with the pensioner-beneficiaries. . . . At all times the trustees had a fiduciary relationship to the retired pensioners And contributing employees . . . .") (emphasis added). See also Cal.Civil Code §§ 2215-2289 (regulation of trusts). If Committee members owed a fiduciary obligation to plaintiff, and if they breached that obligation, such a breach appears to be actionable under California law. See Cal.Civil Code § 2234.
 
 
 40
 Appellees in the district court argued that since Aitken was not an eligible participant in the Plan, they owed no fiduciary obligation to him. We doubt that the California courts would adopt so narrow a view of defendants fiduciary obligations. For summary judgment purposes appellees stipulated that they acquired knowledge of appellant's status as a sole proprietor; we assume the stipulation extends back at least to 1963, the date of the alleged communications between Fred Brooks and the appellees. The Committee nevertheless declined to inform Aitken of his ineligibility until 1973, and continued to accept contributions made on his behalf during that time. The matter is not entirely free from doubt, but under California law the facts alleged in the complaint might be sufficient to impose a fiduciary obligation on the Committee to inform him[6] of his ineligibility within a reasonable time after the Committee acquired knowledge of that ineligibility.[7] See Lix v. Edwards, supra, 147 Cal.Rptr. at 299; Symington v. City of Albany, 5 Cal.3d 23, 95 Cal.Rptr. 206, 485 P.2d 270, 276 (Cal.1971); Zottarelli v. Pacific States Savings & Loan Co., 94 Cal.App.2d 480, 211 P.2d 23, 28 (1949).[8] Further, it is possible that, considering the relation between Aitken and the Committee, the Committee's conduct would amount to deceit under Cal.Civil Code §§ 1709-1710.
 
 
 41
 In addition, as a matter of federal labor law, when the administrator (or trustee) of a section 302 pension fund has been given broad discretion in the management of the trust affairs, his actions as a fiduciary are proper unless "arbitrary, capricious or made in bad faith, not supported by substantial evidence, or erroneous on a question of law." Rehmar v. Smith, supra, 555 F.2d at 1371. Rehmar, and other cases discussing section 302 pension funds, might be understood as holding that federal law, independent of state law, imposes a fiduciary obligation on the Committee. It is possible, assuming plaintiff's complaint to be true, that such an obligation would be found to extend to persons like plaintiff, Cf. Kosty v. Lewis, 115 U.S.App.D.C. 343, 319 F.2d 744, 748-49 (1963).
 
 
 42
 The Eighth Circuit has held that administrators of a section 302 trust have an obligation to make periodic determinations of eligibility. Phillips v. Kennedy, supra, at 55 n.8. We decline at this time to detail the precise boundaries of the duty imposed in Phillips, a duty enforceable in this circuit as well as the eighth. Encompassed within this duty, however, is the obligation to inform an applicant, and his contributing employer, of the applicant's ineligibility within a reasonable time after the Committee acquires knowledge of that ineligibility.[9]
 
 
 43
 The theories of recovery discussed above, while presented in vague outline to the district court, were not the focus of the parties' attention in the proceedings below. We are unable to determine whether the district court considered the above aspect of the case. Accordingly, while we are sensitive to the delays inherent in remanding this case for further proceedings, we find such action appropriate. See Granite Auto Leasing Corp. v. Carter Manufacturing Co., 546 F.2d 654, 656 (5th Cir. 1977); Boazman v. Economics Laboratory, Inc., 537 F.2d 210, 214 (5th Cir. 1976). See also Carter v. Stanton, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972).[10]
 
 
 44
 We do hold that summary judgment was properly entered to reject the claim for intentional infliction of mental distress. The complaint allegations, even if true, do not provide the basis for imposing liability on such a theory. See Fletcher v. Western National Life Insurance Co., 10 Cal.App.3d 376, 89 Cal.Rptr. 78 (1970).
 
 
 45
 If the district court determines that there is no federal law basis for any of Aitken's claims against any of the defendants, then it should determine whether continued retention of Aitken's state law claims is appropriate. See United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Sherman v. British Leyland Motors, Ltd., 601 F.2d 429 (9th Cir. 1979); State of Arizona v. Cook Paint & Varnish Co., 541 F.2d 226, 227 (9th Cir. 1976); Klaus v. Hi-Shear Corp., 528 F.2d 225, 231 (9th Cir. 1975); C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3567 (1975).
 
 
 46
 AFFIRMED in part, and REMANDED for further proceedings.
 
 
 
 *
 Honorable Leonard P. Moore, Senior Judge, United States Court of Appeals for the Second Circuit, sitting by designation
 
 
 [1]
 Article III of the Plan provides:
 
 
 [1]
 Signatory Employers by virtue of a signed collective bargaining agreement requiring payments to the Fund
 
 
 [2]
 Contributing Employers by virtue of signed collective bargaining agreements requiring payments to the Fund comparable to those required of signatory Employers, provided said Employers agree to the terms and conditions of this Trust Agreement and Plan
 
 
 [3]
 Signatory Unions and other Unions of the IPP&AU of N.A. who make contributions on behalf of their members, officers and employees pursuant to procedures established by the Committee
 
 
 [4]
 Employers may make contributions in a like manner for other employee personnel who are not under a collective bargaining agreement
 
 
 [5]
 Participants who submit payments in accordance with any permissible provisions of this retirement plan
 
 
 [6]
 Employees of the Retirement Fund Committee provided payments are made by the Committee in a like manner to other contributors
 
 
 [2]
 Article III:
 The plaintiff in Thurber had not continuously been listed as a participant in the plan. If a person were allowed to receive pension benefits when he began participation, then terminate participation for a substantial period of time, and then years later have his employer make "retroactive contributions" on his behalf, the fund might have difficulty knowing at any point how many people were participating in the plan, it would have lost the benefit of having available the use of the applicant's funds during the years covered by the retroactive payment, and it might not be able to estimate its future financial posture with nearly as much certainty. Thus, arguably the kind of estoppel discussed in Thurber might significantly affect the actuarial soundness of a pension plan.
 
 
 [3]
 In Allied Chemical Workers, the Court held that the term "employee" did not encompass retirees when the question was whether the union's bargaining obligation under section 8(a)(5) encompassed the terms of ongoing benefits paid to retirees. Yet at the same time the Court approved the holding in Blassie v. Kroger Co., supra, the "employee" as used in section 302(c)(5) did encompass "current employees and persons who were * * * current employees but are now retired." 404 U.S. at 169, 92 S.Ct. at 392, quoting 345 F.2d at 70. The Court noted that "the union's role in the administration of the (pension) fund is of a far different order from its duties as collective-bargaining agent." Thus, other language in that opinion such as: "(T)he term 'employee' is not to be stretched beyond its plain meaning embracing only those who work for another for hire,' " 404 U.S. at 166, 92 S.Ct. at 391; Cf. H.R.Rep. No. 245, 80th Cong., 1st Sess. 18 (1947) (bill excluding independent contractors from statutory definition of employee) ("an 'employee,' according to all standard dictionaries, according to the law as the courts have stated it, and according to the understanding of almost everyone . . . means someone who works for another for hire. . . . 'Employees' work for wages or salaries under direct supervision."); and "the ordinary meaning of 'employee' does not include retired workers; retired employees have ceased to work for another for hire,' " 404 U.S. at 168, 92 S.Ct. at 392, does not mean that the word "employee" has a fixed meaning in every section of the LMRA
 
 
 [4]
 In addition, we note that the Internal Revenue Code was amended in 1962 to extend tax benefits similar to those enjoyed by the defendant fund in this case to plans which include sole proprietors and other "owner-employees." See I.R.C. §§ 401(a), (c), (d), 413(b)(3); F. Whiteside, Jr., Self-Employed Individuals Retirement Act of 1962, 51 Ky.L.J. 325, 327 (1962) ("In effect, the self-employed are viewed for retirement plan purposes as both employers and as employees of themselves."). Accord, E. Wood, The Self-Employed Individuals Tax Retirement Act of 1962, 1 Duq.U.L.Rev. 199, 206 (1963); 58 Nw.U.L.Rev. 426, 428 (1963). We attempt no extended examination of the relationship between the tax code and section 302's requirements. We do recognize that the two statutes are informed by different objectives. Nevertheless, it would appear anomalous if an interpretation of section 302(c)(5) were to preclude sole proprietors from participating in section 302(c)(5) retirement funds when the tax code has endorsed such a policy. Further, although including an owner within the definition of an employee would be inconsistent with most provisions of the LMRA, which recognize the divergent interests of labor and management, See, e. g., 29 U.S.C. § 152(3), and (11), we fail to see how including sole proprietors in the definition of employee under section 302(c)(5) would conflict with labor act policies either those recognizing the labor-management separation or those designed to safeguard against improper payments between employers and employee representatives
 
 
 [5]
 For the remainder of the opinion, we will use "the Committee" or "defendants" to refer both to the Fund Committee and to defendants Johnston and Smock
 
 
 [6]
 If a separate employer and employee were involved, we would suppose this duty would run to both
 
 
 [7]
 The Committee's obligation to people in plaintiff's position of course differs from that owed to the eligible beneficiaries of the Retirement Plan
 
 
 [8]
 California courts, like the federal courts, recognize that trustees of section 302 pension plans have wide discretion in the administration of the funds. Accordingly, California courts will not overturn the decision of fund administrators unless it is unreasonable, arbitrary, capricious, or has been made in bad faith. Lix v. Edwards, supra, 147 Cal.Rptr. at 298. It is unclear whether this statement applies only to eligibility determinations under the terms of the pension agreement, or instead extends to all aspects of the trustees' conduct as fiduciaries. In any event, assuming the facts in plaintiff's complaint are proven, the refusal to notify plaintiff of his ineligibility at an earlier date would appear arbitrary and capricious
 
 
 [9]
 We decline at this time to decide whether the Committee breached a fiduciary duty to plaintiff if they should have known of plaintiff's ineligibility and did not so inform him
 
 
 [10]
 We defer discussion of potential damages issues such as whether defendants have compensated plaintiff by refunding with interest the contributions paid to the Fund