**ROSEN, Leon, Appellant**

v.

**HOTEL AND RESTAURANT EMPLOYEES & BARTENDERS UNION OF PHILA., BUCKS, MONTGOMERY AND DELAWARE COUNTIES, PA., Local 274 and Hotel and Restaurant Employees & Bartenders International Union Pension Fund and Victor P. Civatte, Appellees.**

No. 80–1699.

United States Court of Appeals, Third Circuit.

Argued Oct. 14, 1980.

Decided Feb. 23, 1981.

Rehearing and Rehearing In Banc Denied March 20, 1981.

his employer's contributions to the fund were in arrears and a duty to take action against that employer for continued refusal to contribute to the fund. We therefore reverse and hold that Rosen is entitled to full pension benefits.

Stanley Lebofsky (argued), Weinstein, Leonard & Lebofsky Associates, Philadelphia, Pa., for appellant.

Robert W. Costigan (argued), Costigan, Baran & Garber, Philadelphia, Pa., for Hotel & Restaurant Employees and Bartenders International Union Pension Fund.

Warren J. Borish (argued), Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for Local 274.

Before HUNTER, WEIS, Circuit Judges, and FISHER,[*] District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

1. Appellant, Leon Rosen, challenges the denial of his pension application by the Hotel and Restaurant Employees and Bartenders International Union Pension Fund (hereinafter "International Fund"). The district court, 494 F.Supp. 521, ruled that the International Fund correctly denied Rosen's application because he lacked the fifteen years of credited service required for benefits under the pension plan. We find that Rosen's lack of credited service was caused by his employer's failure to contribute to the pension fund as required under the pension agreement. Further, we hold that under the fiduciary duty standards outlined in the pension agreement, the defendants had a duty to notify Rosen when

## FACTS

2. Plaintiff, Leon Rosen, worked in Philadelphia's Walnut House Restaurant from 1958 to 1974 and continued his employment at the Towne Talk Restaurant until 1976. During this entire period he was a dues paying member of the local union; until 1975 that union was the Chef, Cooks, Pastry Cooks and Assistants Union, Local 111 (hereinafter Local 111). In 1975, Local 111 merged into the Hotel and Restaurant Employees and Bartenders International Union of Philadelphia, Bucks, Montgomery and Delaware Counties, Pennsylvania, Local 274 (hereinafter Local 274).

3. In 1967, pursuant to a collective bargaining agreement, Local 111 created the Local 111 pension fund.[1] Under the pension agreement, benefits were provided to those union members who attained the age of sixty-two years and accumulated fifteen years of "credited service." In determining whether an employee's service is "credited" under the plan, two time frames were used; for periods prior to the adoption of the plan (pre-1967), an employee was credited with one year of service for each uninterrupted year in which he was a dues paying member of the union. For periods after the adoption of the pension plan (post-1967), an employee was given one year of credited service for each 1,600 hours of work for which his employer made contributions to the fund.[2]

---

[*] Clarkson S. Fisher, Chief Judge United States District Court for the District of New Jersey, sitting by designation.

1. The Local 111 pension fund, and its successor, the International Union Pension Fund, are jointly administered, multi-employer Trusts maintained pursuant to section 302(c)(5) of the Labor Management Relations Act of 1947, 29 U.S.C. § 186(c)(5) (1976), established to provide benefits for eligible participants through their respective locals. Defendant, Victor P. Civatte was a trustee of the Local 111 Fund.

2. Section Nine of the Local 111 pension agreement provides:

Section 9. "Credited Service" shall consist of either credited past service, credited

4. In 1971 defendant Civatte, Trustee of the Local 111 pension fund, advised Rosen that his pension benefits were in jeopardy because his employer had not been contributing to the pension fund since its inception in 1967. In addition, Civatte gave Rosen a tabulation of his employer's total arrearages to the fund over the past four years—$419.20. Rosen paid this amount personally and Civatte deposited the check into the account of the Local 111 pension fund. It is unclear whether Civatte represented that by paying his employer's arrearages Rosen could preserve his pension eligibility. The testimony conflicts, and the trial court did not make any findings on the question. Nevertheless, at this point Rosen assumed his pension eligibility was intact.

5. In 1975, Local 111 merged into Local 274 of the International Union and on July 9, 1975 the Local 111 pension plan was incorporated into the defendant International Union Pension Fund. The International Fund assumed all the assets and liabilities of Local 111 pension plan but defendant Civatte did not become Trustee of the successor fund.

6. In 1975, after seventeen years of membership with the Union, Rosen submitted his application to the International Fund for pension benefits. On May 18, 1976 the Fund denied appellant's request stating that according to its records he had a total of fifteen years of credited service, but had not reached the minimum retirement age of sixty-two years. The Fund recommended that Rosen continue working until his sixty-second birthday and then reapply.

7. Rosen reapplied for pension benefits in June 1976 and his request was rejected for a second time. On this occasion, the International Fund responded, contrary to what it said in its letter of May 1976, that Rosen did not have fifteen years of credited service because his employer had not remitted contributions on his behalf from October 1967 to November 1971 and that his subsequent employer had not remitted contributions for the period February 1974 to May 1975. The International Fund rejected Rosen's 1971 payment to Civatte, as an attempt to cure his employer's arrearages. Herman Leavitt, Chairman of the Fund's legal committee, advised Rosen that employers' contributions to the Fund must be made by the employer; "there is no provision in the pension plan to allow for payment of contributions to the Fund by an employee for the purpose of acquiring credited service toward a pension benefit."[3] The International Fund returned the $419.20 payment to Rosen with five percent interest compounded annually.[4]

## PROCEDURAL HISTORY

8. After the International Fund's second refusal of his pension request, Rosen filed suit in the Pennsylvania Court of Common Pleas against the International Fund, Local 274 and Civatte. The defendants removed the case to the Eastern District of Pennsylvania pursuant to the general federal removal statute, 28 U.S.C. § 1441 (1976). Rosen filed a motion for summary judgment in which he argued that his employer's failure to make payments from 1967 to 1971 may be a technical bar to recovery, but that the defendants were estopped to assert this defense because Civatte had promised Rosen that personal payment would bring his pension up-to-date. Civatte denied saying

future service, or both. For periods on and after the effective date of this Pension Plan an employee will be credited with one (1) year of credited service for each 1,600 hours of work for which contributions are submitted on his behalf, and one-quarter (¼) year of credited service for each 400 hours or portion thereof for which contributions are submitted on his behalf. For periods of time prior to the effective date of this Pension Plan an employee will be credited with one

(1) year of credited service for each uninterrupted year in which he has been a member of the Union in good standing from his most recent initiation date or readmittance date. Appellant's appendix at 52a.

3. Letter from defendant International Fund to Leon Rosen, (undated) Appellant's appendix 51a.

4. The record does not indicate what has happened to these funds.

that a personal payment by Rosen would cure any pension defects, but admitted meeting with the plaintiff, discussing his employer's arrearages, presenting Rosen with a tabulation of the outstanding debt and depositing Rosen's personal check into the Local 111 pension fund account. The district court recognized the basis for an estoppel argument, but denied the summary judgment motion because there was a question as to what representations Civatte actually made in 1971.

9. At trial, the court held that the International Fund's determination was not arbitrary and capricious and denied Rosen's pension request. In so ruling however, the court never decided the estoppel question left open by the motion for summary judgment. Rather, it assumed an estoppel and hence that Rosen's pension was up-to-date in 1971. But the court found no evidence that any employer contributions had been made on Rosen's behalf from 1971 to 1973; therefore he was still two years short of the required fifteen. In response, Rosen argued that during this time defendants had a duty to notify him of his employer's continued failure to contribute to the Fund and further, that their fiduciary duty required them to take action against the delinquent employer. Pension benefits should not be denied, asserted Rosen, when defendants have breached their fiduciary duty to the pensioner.

10. The court rejected Rosen's claim and held that while the pension fund trustees owed a fiduciary duty to the pensioner, they had complied with their obligations in this case. The trustees visited Rosen's place of employment and allegedly discussed the matter with counsel, but took no action. The court emphasized that Rosen was indifferent and pressured neither the Trustees, the employer nor the union to secure the contributions. By this analysis the court affirmed the pension application denial.

### MERITS

11. We begin by noting that this case began in state court and was removed to federal district court on the basis of federal jurisdiction under § 301(a) of the Labor-Management Relations Act (LMRA), 29 U.S.C. 185(a) (1976). Plaintiff Rosen alleged a violation of the fiduciary duty standard contained in the pension fund agreement. Because this pension plan is an integral part of the collective bargaining agreement, the breach of a section 301 contract has been alleged. *Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d Cir. 1979). Hence the requirements for section 301(a) jurisdiction are satisfied. *See Alvares v. Erickson*, 514 F.2d 156, 161 (9th Cir. 1975); *Nedd v. United Mine Workers*, 556 F.2d 190, 196–97 (3d Cir. 1977).

12. Judicial review of pension trustees' decisions is limited to a determination of whether the trustees' actions were arbitrary and capricious. *Gordon v. ILWU–PMA Benefit Fund*, 616 F.2d 433, 435 (9th Cir. 1980).[5] Although this is a limited standard of review it "leads neither to abdication of traditional judicial control of fiduciaries nor to excessive judicial intervention in trust operations, in harmony with federal labor policy." *Rehmar v. Smith*, 555 F.2d 1362, 1371 (9th Cir. 1976).

**5.** We note that, although not alleged, the gist of Rosen's complaint may state a cause of action under § 502(a)(1)(B) of ERISA. 29 U.S.C. § 1132(a)(1)(B) (1976). There is some conflict among the circuits as to whether ERISA applies to pension contracts that existed before and after the enactment date (Jan. 1, 1975 for most provisions). *Compare Riley v. Meba Pension Trust*, 570 F.2d 406, 411 (2d Cir. 1977); *and Morgan v. Laborers Pension Trust Fund for Northern Cal.*, 433 F.Supp. 518, 522 n.5 (N.D. Cal.1977) *with Martin v. Bankers Trust Co.*, 565 F.2d 1276, 1278–79 (4th Cir. 1977); *and Finn v. Chicago Newspapers Publishers' Ass'n.*, 432 F.Supp. 1178, 1179 (N.D.Ill.1977).

For our purposes, it is enough to say that had this action been brought under ERISA, the same arbitrary and capricious standard of review would apply. *Bayles v. Central States Southeast and Southwest Areas Pension Fund*, 602 F.2d 97, 100 n.3 (5th Cir. 1979); *Bueneman v. Central States Southeast & Southwest Areas Pension Fund*, 572 F.2d 1208 (8th Cir. 1978).

13. To qualify for pension benefits, Rosen must have been at least sixty-two years of age and have had fifteen years of credited service. In June of 1976, when Rosen applied for the second time, he was sixty-two years old. He received nine years of credited service (1958–1967) for his work prior to the adoption of the Local 111 credit plan. This case revolves around whether Rosen received credit for the remaining six years—1967 to 1973. This period can be divided into two parts: first, from the initiation of the plan in 1967 until Civatte deposited the employer's arrearages into the fund. Second, from 1971 until 1973 when, if Rosen's employer had submitted payments, Rosen would have qualified for benefits with fifteen years of credited service.

*1967–1971*

14. Rosen's employer made no payments to the pension fund on Rosen's behalf during the 1967–1971 period. The defendants argue that Rosen's payment of employer's arrearages did not entitle him to credited service because it was in violation of the pension plan requirement that all contributions be made by the employer, not the employee.[6] We do not address the merits of this claim because Civatte's acceptance of Rosen's check on behalf of the fund estops the defendants to assert this defense.

■ 15. The principle of estoppel is the "representation of fact made to a party who relies thereon with the right to so rely, [that] may not be denied by the party making the representation if such denial would result in injury or damage to the relying party." 1 S. Williston, *Williston on Contracts* § 139, at 600 (3d ed. 1957); *Haeberle v. Board of Trustees of Buffalo Carpenters,* 624 F.2d 1132, 1139 (2d Cir. 1980). We find these elements present and affirm the validity of Rosen's pension until 1971.

■ 16. In 1971, defendant Civatte, then trustee of the Local 111 pension fund, advised Rosen that his pension was in jeopardy due to his employer's failure to contribute to the fund.[7] It is unclear whether Civatte told Rosen that by paying his employer's arrearages out of his own pocket he could preserve his pension. Nevertheless, Civatte's actions and admitted statements create an estoppel against the defendants. Civatte met with Rosen and discussed the threat to his pension by his employer's failure to contribute; Civatte gave Rosen a tabulation of his employer's arrearages for the 1967–1971 period (Plaintiff's exhibit P-4); Rosen made out a check for $419.20—the total amount of his employer's arrearages; Civatte deposited this money into the account of the Local 111 pension fund. At this point Rosen had every reason to believe that his payment had brought his pension up-to-date. Under the circumstances Rosen's detrimental reliance on Civatte's action was clearly reasonable.[8]

---

6. Article II, Section 1 of the pension plan states: "Every employee, as defined herein, on whose behalf payments are made to the Local 111 pension trust fund by an employer, as herein defined, shall be a participant of the pension plan."

   Article I, Section 5 of the plan defines "employer" to be: "any person, firm, association, partnership or corporation contributing to the Local 111 pension trust fund as required by the collective bargaining agreement between such employer and the Local Union, including the Local Union as employer." Defendants argue that these provisions—prohibiting personal payment of employer's debt by employee—were included to prevent an employer from levying a *de facto* reduction in wages upon an employee by forcing him to pay his own contributions. Because we rule that defendants are estopped to assert this defense by Civatte's acceptance of Rosen's personal payment, we do not reach the merits of this claim.

7. Defendants argue that Rosen's reliance on Civatte's statements and acceptance of the check in 1971 was unwarranted because, Civatte was only one of the four trustees administering the fund and hence he did not have the actual authority to make decisions for the plan. We reject this argument. In 1971, Civatte was the secretary of the Trustees for the trust fund and this position created the apparent, if not the actual, authority to act on the Trust's behalf. Hence Rosen's reliance on Civatte's representations was reasonable.

8. The International Fund's May 18, 1975 letter which stated that Rosen did have fifteen years of "credited service" is an additional factor supporting Rosen's claim of detrimental reliance.

17. Defendants argue that even if the technical requirements for estoppel are present, courts have been reluctant to apply estoppel in pension cases. In *Phillips v. Kennedy*, 542 F.2d 52 (8th Cir. 1976), the court declined to apply estoppel against defendant where the local union official and a fund trustee made assurances to ·plaintiff that he would be included in pension plan. The court stated: "The actuarial soundness of pension fund is, absent extraordinary circumstances too important to permit trustees to obligate the fund to pay pensions to persons not entitled to them under the express terms of the pension plan. *Phillips*, 542 F.2d at 55 n.8. *See also Thurber v. Western Conference of Teamsters Pension Plan*, 542 F.2d 1106, 1109 (9th Cir. 1976). We are sensitive to the *Phillips* court's concern for actuarial soundness, but that is not an issue in this case.[9] In our case Rosen relied on more than mere assurances made by the trustees. Civatte deposited his monies into the Fund's account. Indeed, this case can be classified as one of the "extraordinary circumstances" as outlined by the *Phillips* court.

18. Further, the application of estoppel in pension disputes is not altogether novel. In *Scheuer v. Central States Pension Fund*, 358 F.Supp. 1332 (E.D.Wis.1975), *on rehearing*, 394 F.Supp. 193 (E.D.Wis.1975) *aff'd*, 570 F.2d 347 (7th Cir. 1977), the court held a trustee's decision to deny a pension as arbitrary in light of prior assurances to the employee that he would qualify. On applying the law of estoppel in the area of pension agreements the court said:

> The *sui generis* nature of the pension agreement ... should not immunize it

from the equitable principles that govern similar agreements. The rising ethical standards in business relations which the estoppel doctrine is designed to enforce are no less needed in the administration of pension funds ... If anything, estoppel is appropriate here. The complexity of the typical fund agreement and the trustees' freedom to decide as they wish make it unlikely that workers will disregard promises made to them.

*Id.* at 1338. We agree with this analysis. The argument for estoppel in this case is similar to that in *Scheuer*. Rosen was initially approached by Civatte with the tabulation of his employer's arrearages and then paid this debt from his own funds. The existence of this tangible detrimental reliance bars the Fund from now denying his pension on the basis of that payment.

### 1971–1973

■ 19. When Rosen's second application for pension benefits was denied, Herman Leavitt, chairman of the International Fund's legal committee told Rosen that his employer had failed to contribute funds from 1967 to 1971 and from 1974 to 1975. It was revealed for the first time at trial that Rosen's employer also failed to contribute from 1971 to 1973. It is this latter period—the fourteenth and fifteenth year of Rosen's service under the terms of the plan—that raises the question of defendants' fiduciary duty. Rosen asserts that as fiduciaries, Civatte and the International Fund had an obligation to inform him of his employer's arrearages, and further to take action against the employer for his failure to contribute as required by the pension plan. The district court found that the

---

**9.** The $419.20 which Civatte deposited into the fund covered contributions for all but two years of the required fifteen. On the question of actuarial soundness we agree with the analysis of the ninth circuit in *Aitken v. IP & GCU·· Employer Retirement Fund*, 604 F.2d 1261, 1268 (9th Cir. 1979):

> We perceive no substantial danger to the actuarial soundness of the defendant fund if they are required to pay retirement benefits to plaintiff in accordance with the terms of

> the retirement plan agreement.... Plaintiff may end up receiving more in benefits from the Fund than the Fund has received as a result of his contributions, or he may receive less; this is the expected actuarial risk which the Pension Fund takes with all participants.

*Id.* (footnotes omitted). In addition this case does not involve a suit for punitive damages against the fund so Rosen's recovery is limited to the forty-eight dollars per month he is entitled to under the plan agreement.

International Fund and Civatte had such a duty, but discharged it in this case. We agree that the duty existed but not that it was discharged.[10]

20. Identifying the source of a fiduciary duty is the first step in determining the obligation required to discharge it. In this case, defendants' duty originates in the pension agreement. Article Nine states:

### FIDUCIARY DUTIES

9.01 The Trustees, Plan Administrators, Investment Managers and others acting as fiduciaries of the Pension Fund and Pension Plans administered hereunder shall discharge their duties:

(a) Consistent with the requirements of ERISA and in the sole interest of the beneficiaries of the Pension Plans; and

(b) so as to keep the assets of this Trust within the jurisdiction of the United States Courts.

Amended Pension Agreement, Appellant's appendix at 72a. This section incorporates the fiduciary requirements of ERISA, located at § 404, 29 U.S.C. § 1104 (1976). These standards require the fiduciary of a pension fund to:

discharge his duties with respect to a plan solely in the interest of the participants and their beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . .

*Id.* § 1104(a)(1)(A) & (B).

The Chairman of the Senate Committee on Labor and Public Welfare, providing a context for these standards, emphasized the need for a uniform body of federal law founded on the principles of common law trusts:

[T]he legislation [ERISA] imposes strict fiduciary obligations on those who have discretion or responsibility respecting the management, handling, or disposition of pension or welfare plan assets. The objectives of these provisions are to make applicable the law of trusts; to prohibit exculpatory clauses that have often been used in this field; to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets; and to provide effective remedies for breaches of trust.

120 Cong.Rec. 15737 (1974) (Comments of Sen. Williams when introducing the Conference Report), *reprinted in,* [1974] U.S.Code Cong. & Ad.News 5177, 5186. This language indicates that in applying the fiduciary standards of ERISA, courts are to be sensitive to the need for uniformity in the interpretation of pension trustee's obligations.

■ 21. At a minimum, the fiduciary obligations of a pension fund trustee require that he notify the pensioner of his

---

**10.** Under the circumstances here, the defendant International Union does not have a fiduciary duty to oversee the employer's pension payments. While the union does owe a duty of fair representation to its members, *Findley v. Jones Motor Freight,* 639 F.2d 953, 955 Nos. 80-1486–87, 80–1705 (3d Cir. Jan. 21, 1981), it does not control, nor is it in a position to oversee, the employer's contributions to the fund. *United States v. Santiago,* 528 F.2d 1130, 1133 (2d Cir.) *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976). Hence, the discussion of defendants' fiduciary obligations to pensioners will refer to the International Fund and Civatte only.

employer's failure to contribute to the fund as required by the pension agreement. This duty has roots at common law [11] and was expounded more recently by the eighth circuit in *Phillips v. Kennedy*, 542 F.2d 52, 55 n.8 (1976). In *Phillips*, the court denied pension benefits to an employee's widow because of a break in service during the deceased employee's union tenure. In so doing however, the court was careful to elaborate on the pension fund trustee's continuing duty to inform the plan participants of their eligibility: "We do emphasize, however, that it is the duty of the trustees to verify on a regular basis the eligibility of those for whom contributions are being made. The breach of that duty might well expose the trustees to personal liability in an appropriate case." *Id.* In *Aitken v. IP & GCU–Employer Retirement Fund*, 604 F.2d 1261, 1271 (9th Cir. 1979), the court declined to impose precise limits on the trustee's fiduciary duty to notify beneficiaries, but did say that it included the "obligation to inform an applicant, and his contributing employer, of the applicant's ineligibility within a reasonable time after the Committee acquires knowledge of that ineligibility." 604 F.2d at 1271 (footnote omitted).

■ 22. We agree with the standard enunciated in *Phillips* and supported in principle by *Aitken*. If a trustee's fiduciary duty requires anything in the administration of the trust, it requires him to inform the pensioners of their employer's failure to make the required contributions to the fund. Continued eligibility is the core of the trustee beneficiary relationship and those responsible for the administration of the fund are required to notify pensioners when their employer jeopardizes their eligibility. *See Phillips*, 542 F.2d at 55 n.8. In this case, the defendant Fund and Civatte failed to contact Rosen about his employer's arrearages from 1971 to the end of his employment in 1976. Indeed, the International Fund's first communication to Rosen stated, erroneously, that he had accumulated the requisite fifteen years of credited service. This misinformation does not comport with their responsibility as fiduciaries.

23. In addition, defendants' status as fiduciaries requires them to take action against employers who fail to contribute to the fund as required by the plan. This obligation could require the trustees to commence suit, or to picket the non-contributing employer; but some action must be taken to safeguard beneficiaries' credited service.[12] In this case defendants claim that such action was contemplated against Walnut House, Rosen's employer from 1971 to 1975, but was not taken because plaintiff's sister-in-law owned the restaurant and defendants were reluctant to get embroiled in a family dispute. While it is true Rosen's sister-in-law owned Walnut House, she sold all interest in the restaurant in 1969. From 1969 to 1971 it was owned by Mr. Kane who thereafter sold it to Mr. Gonzales. Hence defendant's claim of inaction out of a deference to familial relations is not supported by the facts. The crucial time frame is 1971 to 1973; Rosen's sister-in-law sold the restaurant in 1969.

24. Defendants argue in the alternative that their inaction was explained by the precarious financial situation of the restau-

---

11. The Restatement of Trusts (Second) underscores the trustee's duty to communicate material facts to the beneficiaries:

> [The trustee] is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person with respect to his interest.
> Restatement (Second) of Trusts § 173, Comment b, (1959).

12. Defendant Civatte stated at trial that he thought he discussed the problem of non-payment with legal counsel, but no action was taken.

rant business in the early seventies. Civatte testified that many area restaurants were forced out of business between 1966 and 1976 and pressing the employer for pension contributions would have risked the employer's financial collapse. We cannot accept this rationale. Rosen's payment of his employer's obligations over four years was a little over four hundred dollars. There is no evidence to suggest that this amount would risk the employer's financial ruin. Plainly, defendants' sole alleged action—contacting a lawyer and deciding not to act—does not discharge their responsibility as fiduciaries. Defendants are therefore liable for the benefits that would have accrued to Rosen had they fulfilled their fiduciary duties.

25. In conclusion, we hold that the Fund's denial of Rosen's benefits was arbitrary and capricious. The district court's judgment is reversed and the case remanded to that court with instructions to fashion a judgment against the International Fund and Civatte affording Rosen full pension benefits.