Howard N. SCHEUER, Plaintiff,

v.

CENTRAL STATES PENSION FUND, a
foreign corporation, Defendant.

Civ. A. No. 69–C–636.

United States District Court,
E. D. Wisconsin.

June 4, 1973.

Miriam L. Eisenberg, Milwaukee, Wis., for plaintiff.

Alan M. Levy, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

JOHN W. REYNOLDS, Chief Judge.

Plaintiff, a member of the teamsters union for more than thirty years, is seeking pension benefits from the de-

fendant pension fund. The fund, which is administered by a board of trustees composed of an equal number of employer and teamster representatives, has declared plaintiff ineligible for benefits on the ground that his self-employed status between 1956 and 1965 constituted a break in service within the meaning of the pension fund. The effect of finding a break in service is that plaintiff lost all service credit for his work prior to the break and hence has failed to accumulate the twenty years of service needed for eligibility. Plaintiff claims that he did not break his term of service and, alternatively, that even if he did, defendant is estopped from denying benefits because plaintiff was assured, after his break in service, that he would now be eligible and he has relied, to his detriment, on that assurance. Jurisdiction is based on diversity of citizenship, and the parties do not contest that Wisconsin law applies.

Defendant has moved for summary judgment claiming that as a matter of law the trustees' decision that plaintiff was self-employed between 1956 and 1965 must be upheld and that this decision alone is an absolute bar to any relief. I cannot conclude that the trustees' decision must be upheld. I do conclude that there are facts in genuine dispute which are material to plaintiff's estoppel claim, and that the estoppel claim cannot be dismissed as a matter of law.

The affidavits and depositions submitted reveal the following facts. In 1937 plaintiff joined the teamsters union as a truck driver. At first, plaintiff was a member of Local 619; he transferred his membership to Local 563 in 1942 and then to Local 200 in Milwaukee in 1965.

Since 1949 plaintiff has been hauling groceries and produce on a regular basis for the E. R. Godfrey Company of Milwaukee. Primarily he has driven the company trucks and trailers; he has been paid by the mile for this driving and by the hour for loading, unloading, and other personal services. He has also owned his own tractor throughout this

period and has been paid by the mile for its use as well.

In 1956 Ball Motor Service (hereafter "Ball") assumed responsibility for hauling the Godfrey products. Though plaintiff's work was not affected, save perhaps for a change in uniform and in the lettering on his tractor, his paper status changed completely. Where before he had clearly been treated as an employee of Godfrey, he now entered a lease agreement with Ball which made him appear much like an independent contractor. The details of his status are described below, but among other things Ball did not pay pension benefits for plaintiff as Godfrey had done before, nor did plaintiff attempt to pay benefits on his own behalf.

This situation continued for nine years. Then in 1965 when plaintiff switched to Local 200 in Milwaukee, he arranged for Ball to pay into the pension fund the amount which should have been paid over the last nine years, a total of $1,053.60, and to make regular payments on plaintiff's behalf from that time forth. Plaintiff personally reimbursed Ball for all payments.

Plaintiff claims that he only paid the amount due between 1956 and 1965 and arranged for continuing payments because he was promised by the teamsters' representative, Clarence Johannes, in 1965, that he would be eligible for the pension in 1968 when he reached the age of 57. Mr. Johannes denies making such a promise.

In denying plaintiff's application in 1969, the trustees indicated briefly by letter that since no wages were reported to the Social Security Administration from 1956 to 1965, it appeared plaintiff was self-employed in that period. The trustees did not find that plaintiff would have been eligible were it not for his self-employed status during that period.

## I.

It should be noted at the outset that contrary to the implication in plaintiff's brief a finding that plaintiff was not self-employed between 1956 and 1965 does not necessarily result in declaring plaintiff eligible for pension benefits. The trustees did not find, nor does it appear from the record, that plaintiff would otherwise be eligible were it not for his self-employed status. On the contrary, examination of the pension plan suggests that plaintiff's failure to have payments made into the fund by his employer between 1956 and 1965 may have constituted a break in service even if plaintiff were an employee during that period.[1] But since defendant has based this motion for summary judgment solely on the claim that plaintiff was self-

---

1. Examination of the agreement establishing the fund and the printed manual explaining the fund to the members indicates the fund is established on the assumption that the employer will make regular continuing payments during any term of employment which the employee hopes to count. For instance, an employee may not count any time in which he worked for an employer who did not pay into the fund, and an employee will break his service if he works for such an employer for more than three consecutive years. Indeed, an employee whose employer does not pay into the fund is not even an "employee" as that term is defined by the pension agreement. Article 1, § 7, provides in relevant part:

"*Employee*, as used herein, shall include:

"(a) a person * * * who has been on the payroll of an employer for thir-

ty (30) days or more and is employed under the terms and conditions of a collective bargaining agreement entered into between an employer and a union and *on whose behalf payments are made to the Trust Fund by the employer; * * *.*" (Emphasis added.) Pension Plan Manual, p. 35.

Moreover, nothing in the contract allows an employer or employee to pay up for the time in which payments were not made. To allow unreasonably late payments would, of course, deprive the fund of the use of the payments during the delinquent period. Since, as plaintiff was aware, no payments were ever made on his behalf between 1956 and 1965, there appear to be several possible grounds for refusing to give service credit for those years and for finding that his status during those years constituted a break in service.

employed, it would be premature to evaluate all other possible reasons for the trustees' decision especially since they have not been given. Moreover, under the view adopted here, plaintiff will be entitled to relief regardless of the basis of the trustees' action if he prevails on the estoppel claim.

■ Defendant emphasizes that the pension agreement puts sole responsibility for determining eligibility into the hands of the trustees and that the trustees' decision is not to be overturned unless it is arbitrary. Gaydosh v. Lewis, 133 U.S.App.D.C. 274, 410 F.2d 262 (1969). Defendant contends the rule of thumb used by the trustees in distinguishing employees from self-employed independent contractors, namely, whether the alleged employer paid social security benefits, is in itself a reasonable basis for decision. I disagree. Even assuming that the purposes of the Social Security Act are the same as the purposes of the pension fund and that hence the meaning of "self-employed" is the same in both,[2] there is no indication the administrators of the Social Security Act ever determined that it was proper for plaintiff to file as self-employed. Surely the fact that Ball and plaintiff contracted for plaintiff to file as self-employed is not conclusive:

> " * * * Contracts, however 'skilfully devised,' Lucas v. Earl, 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731, should not be permitted to shift tax liability as definitely fixed by the statutes." United States v. Silk, 331 U.S. 704, 715, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947).

As plaintiff points out, using social security records which at best indicate the parties' conception of their relationship supplies ready conclusions without any examination of the actual situation. The trustees' desire to use a standard which facilitates administration of the fund is understandable, but the magnitude of an applicant's interest merits more thorough examination.

Defendant also contends that even if the trustees' rule of thumb was an unsatisfactory rationale, their conclusion that plaintiff had been self-employed between 1956 and 1965 was reasonable in light of all the circumstances. Defendant's contention is supported by several facts. When Ball took control of trucking in 1956, plaintiff entered into a leasing agreement with him. (Ptf's dep. at 7.) The lease which was renewed each year in substantially the same form (Ball's dep. at 4) provided that Ball would rent plaintiff's tractor for 26½ cents per mile, payment to be made on a weekly basis, and plaintiff was to pay all license fees, taxes, and operating and maintenance expenses. Ball's collision liability was limited to $25.00. Plaintiff assumed responsibility for employing and paying the driver of the tractor including the payment of any social security, unemployment compensation and workmen's compensation insurance, and withholding taxes. Plaintiff also agreed to hold Ball harmless for any injury to the driver. (Ex. No. 1 attached to Ball's dep.) Pursuant to the leasing agreement plaintiff paid his own social security contributions and income taxes. Plaintiff also took advantage of the lease agreement to employ a driver for brief, irregular periods prior to 1959. Though plaintiff's name appeared on Ball's employee seniority list, he did not fall under the seniority rules for work assignment, retaining the same route, mileage, and hourly wages from 1956 to 1965. (Ball's dep. at 1.) Nor did plaintiff receive certain fringe benefits such as health insurance granted Ball's acknowledged employees. (Ball's dep. at 7.)

---

**2.** It is not clear under the pension agreement which definition of the master-servant relationship is to be used. Article 1, § 7(d), states that the "common law test, or the applicable statutory definition of master-servant relationship shall control," but how a statutory definition is found applicable is not explained. Since the trustees' practice is to base decisions on payment of social security contributions, the definitions used under the Social Security Act are most likely applicable.

To evaluate the effect of these factors and those mentioned below, the criteria used in similar contexts to distinguish the self-employed from the employed should be considered. One similar context in which this distinction is often necessary is, of course, a dispute about what party should properly have paid social security taxes. There, as here, the distinction is drawn in light of the purpose of protecting those who labor for others from some of the insecurities of modern life which confront the elderly.[3] In the leading opinion concerning the Social Security Act, United States v. Silk, 331 U.S. 704, 716, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947), the United States Supreme Court held that:

> " * * * degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claim independent operation are important for decision. No one is controlling nor is the list complete. * * * "

Treasury Regulation 90, promulgated under Title IX of the Social Security Act, Art. 205, provides:

> "(b) Generally the relationship of employer and employee exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. * * *

> "(c) Generally, physicians, lawyers, dentists, veterinarians, contractors, sub-contractors, public stenographers, auctioneers, and others who follow an independent trade, business, or profession, in which they offer their services to the public, are not employees."
> 26 C.F.R. 31.3401(c)—1(b) and (c).

This test does not seem significantly different as applied to this case from the so-called "right of control" test which has long been used in this circuit to determine whether certain laborers were "employees" within the meaning of § 7 of the National Labor Relations Act as amended by the Taft Hartley Act, 29 U.S.C.A. § 152(3). A thorough exposition of this test is contained in Judge Duffy's opinion in N.L.R.B. v. Phoenix Mutual Life Ins. Co., 167 F.2d 983, 986 (7th Cir. 1948). See also National Van Lines, Inc. v. N.L.R.B., 273 F.2d 402 (7th Cir. 1960). These tests appear to include more persons in the category of employees than does the "common-law" test used to determine whether vicarious liability for another's actions should be imposed upon the alleged employer.

Whichever test is used, however, I believe the following facts reveal that the plaintiff operated in substance as an employee despite the contractual arrangement. First, Ball exercised as much control over plaintiff as Godfrey had exercised before and as Ball exercised over his acknowledged employees. Under the lease Ball exercised exclusive possession, control, and use of plaintiff's tractor. (Ex. No. 1 attached to Ball's dep.) Plaintiff himself was not even licensed to operate it except under Ball's LC number. (Ptf's dep. at 15.) Ball carried full responsibility to the public, the shipper, the Public Service Commission, and the State Motor Vehicle Department. Ball also was required to carry substantial insurance coverage. (Ex. No. 1 attached to Ball's dep.) When plaintiff worked in and around the warehouse on various jobs for which he was paid by the hour, he was plainly under the supervision of Ball or Godfrey.

3. Another similar context is a dispute about whether unemployment compensation should have been paid for a worker under state law. See, e. g., Moorman Mfg. Co. v. Industrial Commisson, 241 Wis. 200, 5 N.W.2d 743 (1942). In Wisconsin "employee" is defined very broadly in such disputes in order to fulfill the purpose of the unemployment compensation law. See Wis.Stats. § 108.-02(3) (1971).

(Ptf's affidavit at 3.) Nor was plaintiff on his own when he was driving. Ball assigned each run, prescribed the particular hours plaintiff was to report for his runs, specified the particular highway routes plaintiff had to travel, and directed the method of loading, unloading, and delivery. (Ptf's dep. at 4–5.) Plaintiff was not able to refuse an assignment or to assign one to another person, and it appears that Ball had authority to discharge him. (Ptf's affidavit at 3.) Ball also had authority to reject any substitute driver plaintiff wished to use, and when on the job, the substitute would be subject to Ball's control. (Ptf's affidavit at 4.) Ball required plaintiff, along with the rest of his drivers, to keep certain records on forms Ball provided showing, for example, the time of departure, the time of work breaks, the time taken to eat dinner or to make repairs, and the reasons for any delay. Plaintiff was allowed the same break period and was obliged to perform the same duties as other employees. (Ptf's affidavit at 4–6.)

Second, it cannot be said that plaintiff was employed in an occupation distinct from that of Ball. The sole function of Ball was to provide transportation services. To that end Ball employed more than thirty truck drivers who performed the same work as plaintiff. (Simaldi's dep. at 11.) Plaintiff did not operate his own business with its own opportunity for profit or loss in any significant sense. Even the uniform he was required to wear and the lettering he was required to display on his tractor announced that he worked for another. (Ptf's affidavit at 4.) The regularity of his hours and the length of his service with one company exclusively further belie the image of a risk-taking business which was independent of Ball and who had sufficient economic independence to bargain with clients on his own behalf. Finally, since plaintiff's personal work, apart from the renting and handling of his tractor, was indistinguishable from that of Ball's other employees, there is a strong basis for finding that at least the income he earned from that work was earned as an employee and that he should receive an appropriate amount of service credit for it, even if he receives no credit for the work involved in renting his tractor. Significantly, plaintiff always submitted two billings and received two checks, one for plaintiff's personal services and one for the rental of the tractor. (Ball's dep. at 8.)

In regard to plaintiff's actual operation the issue is, in short, whether all these contradictions of a self-employed status are overcome by plaintiff's ownership of a tractor, by his authority under the contract to hire a driver (who, of course, had to be approved by Ball), and by his exercise of that authority on brief, infrequent occasions during the first three of the nine years in question. I do not believe these particular factors suggestive of self-employed status are conclusive. And when all the facts surrounding the actual relationship are considered, especially the extensive control exercised by Ball over plaintiff, I do not find that plaintiff was self-employed. Nor is the question so close that I must defer to the trustees' decision, especially since the evidence indicates that they did not consider plaintiff's actual relationship but based their decision solely upon Ball's failure to pay social security contributions for plaintiff.[4]

---

4. The question of the degree of deference owed to the trustees' decision is admittedly difficult. Viewing the pension agreement as a contract between the employee and the fund makes apparent the inequity created when the trustees have absolute power to settle for themselves any disputes arising under the agreement.

  " * * * The judicial mind is so strongly against the propriety of allowing one of the parties * * * to be judge or arbitrator in its own case, that even a strained interpretation will be resorted to if necessary to avoid that result. * * *" Railway Passenger & Freight Conductors' Mutual Aid & Benefit Association v. Robinson, 147 Ill. 138, 159–160, 35 N.E. 168, 176 (1893).

  A major purpose furthered by recognizing unchecked power in the trustees is

## II.

Plaintiff also claims that regardless of whether he is eligible under the pension agreement, defendant is estopped from asserting his noneligibility because of the promises Johannes allegedly made to plaintiff in 1965. Defendant answers first that the terms of the pension agreement are the sole basis for determining eligibility, i. e., that under the law estoppel is not a basis for relief, and second, that even if certain actions or promises may establish estoppel, the acts and promises alleged in this case do not.

■■ I conclude that estoppel may be a basis for relief in actions by employees to receive pension benefits. Although no cases granting relief on this basis have been found, courts have referred favorably to the use of estoppel principles in pension eligibility disputes. Hunter v. Sparling, 87 Cal.App.2d 711, 197 P.2d 807 (1948); Langer v. Superior Steel Corp., 105 Pa.Super. 579, 161 A. 571 (1932). Without exception, commentators who have examined the implications of the increasing popularity of private pension funds believe that estoppel is an appropriate and much needed basis for relief. Pension Plans and the Rights of the Retired Worker, 70 Col.L.Rev. 909, 920 (1970); Legal Problems of Private Pension Plans, 70 Harv. L.Rev. 490, 496 (1957); Note, 23 U.Ch. L.Rev. 96, 110 (1955). In Wisconsin, as elsewhere, estoppel has continued to gain acceptance in other contexts. Hoffman v. Red Owl Stores, Inc., 26 Wis.2d 683, 133 N.W.2d 267 (1965); Feinberg v. Pfeiffer Company, 322 S.W.2d 163 (Mo. App.1959); West v. Hunt Foods, Inc., 101 Cal.App.2d 597, 225 P.2d 978 (Dist.

Ct.App.1951). In Hoffman v. Red Owl Stores, Inc., supra, for example, the Wisconsin Supreme Court adopted the principle of promissory estoppel and gave relief to an applicant for employment who relied to his detriment on the promise that he would be employed, even though the promise was too indefinite to create a contract. Were the pension agreement considered a contract, with the consideration being the workers' continued loyalty to the union and service to the employer, a promise by the trustees contrary to the terms of the agreement might even be considered an enforceable modification of the agreement. See Wis. Stats. § 402.209.

■ The sui generis nature of the pension agreement, referred to by Judge Tamm in Roark v. Lewis, 130 U.S.App. D.C. 360, 401 F.2d 425 (1968), should not immunize it from the equitable principles that govern similar agreements. The rising ethical standards in business relations which the estoppel doctrine is designed to enforce are no less needed in the administration of pension funds. Peoples National Bank of Little Rock v. Linebarger Construction Co., 219 Ark. 11, 17, 240 S.W.2d 12 (1951). If anything, estoppel is more appropriate here. The complexity of the typical fund agreement and the trustees' freedom to decide as they wish make it unlikely that workers will disregard promises made to them. The hardship inflicted on those who rely upon promises is often severe.

■ The question remains whether the facts alleged in this case are sufficient to create a jury question on the estoppel claim.[5] As defendant points

---

to enable them to make the policy changes which may be necessary to preserve the fund in light of changing business conditions. See Gaydosh v. Lewis, 133 U.S. App.D.C. 274, 410 F.2d 262 (1969); Miniard v. Lewis, 128 U.S.App.D.C. 299, 387 F.2d 864 (1967). Hence, it has been suggested that only those decisions of general application made for reasons of business necessity are entitled to great deference. Note, Legal Problems

of Private Pension Plans, 70 Harv.L.Rev. 490, 496 (1957).

5. Plaintiff is entitled to an independent evaluation of his estoppel claim despite the trustees' decision to refuse benefits. Whatever deference is owed the trustees in making general policy decisions or interpreting the agreement, it would be incongruous for them to decide finally whether their own actions have, as an equitable

out, the trustees themselves made no promises nor did their designated agents. Plaintiff therefore bases estoppel on the theory of implied agency, claiming that in part because of defendant's actions Johannes had apparent authority to bind defendant and, hence, that defendant should bear the costs incurred as a result of plaintiff's reasonable but mistaken reliance on Johannes' promise.[6]

The doctrine of apparent authority is discussed in numerous cases and treatises. See, e. g., 28 Am.Jur.2d, Estoppel; 1 Restatement, Agency, § 8 at 25. The rule in Wisconsin appropriate in this context is that if a third person, because of appearances resulting from the manner in which the principal conducts his business, believes and has reasonable grounds to believe that the agent possessed power to act for the principal in the particular transaction, then the principal is responsible to such third person the same as if the agent possessed all the power he was assumed to possess. ABC Outdoor Advertising, Inc. v. Dolhun's Marine, Inc., 38 Wis.2d 457, 157 N.W.2d 680 (1968); Risdon, Inc. v. Miller Distributing Co., 29 Wis. 2d 418, 139 N.W.2d 12 (1966); Voell v. Klein, 184 Wis. 620, 200 N.W. 364 (1924). Wisconsin also follows the rule that issues of apparent authority are to be resolved by a jury. Harris v. Knutson, 35 Wis.2d 567, 574, 151 N.W.2d 654, 659 (1967).

Plaintiff believes the following characteristics of the defendant's operations made it reasonable for him to rely on Johannes' promise.[7] The trustees explained the plan to the employees through distribution of a manual entitled "Central States, Southeast and Southwest Areas Pension Plan." The manual which consists of fifty pages is written in a concise, detailed manner with several explanatory charts and other visual aids; a copy of the legal agreement is contained at the end. Though the reader is advised on the bottom of one page to consult the legal agreement for the exact terms of the plan, the style of the manual's explanation is authoritative. After explaining the fund and indicating that the board of trustees is composed of an equal number of employer and union representatives, the manual answers questions which it assumes members are likely to ask. Plaintiff claims his reliance on Johannes' promise was supported by question and answer number "7":

"Q. HOW DO I KNOW IF I AM A MEMBER OF THE PENSION PLAN?

"A. *Your union or your employer will let you know.* If contributions are being made to the Fund, you are a member." (Emphasis added.) Pension Plan Manual, p. 30.

Question and answer number "1" also suggest that the local union representative was the defendant's field representative, since it directs a person who seeks to join the fund to obtain the necessary forms from the union. Although the manual states rather inconspicuously that inquiries regarding the plan should be directed to the defendant's headquarters, it contains no clear indication that the union representative is not authorized to speak for the defendant.

matter, estopped them from refusing benefits. Courts have recognized that the employees' reasonable expectations of receiving the promised reward must be protected even though the agreement puts the administration of the fund in the absolute discretion of the trustees. Cantor v. Berkshire Life Ins. Co., 171 Ohio St. 405, 171 N.E. 518 (1960).

6. Plaintiff also contends that defendant ratified Johannes' promise by accepting plaintiff's payments in silence. But to bind defendant by its silent ratification alone, plaintiff must show that defendant knew of Johannes' promise. 1 Restatement 2d, Agency § 91 at 231; Shearer v. Dunn County Farmers Mut. Ins. Co., 39 Wis.2d 240, 247, 159 N.W.2d 89, 95 (1968).

7. These allegations are presumed true for purposes of this motion only. Several material matters of fact, such as whether Johannes ever made any promise to plaintiff in 1965, are genuinely disputed.

**1340**

The day-to-day method of administering the fund also suggested that Johannes was the defendant's agent. Since defendant merely maintained the regional office in Chicago and did not employ field representatives, the burden of handling most of the questions and complaints fell upon the union. It was at the union office where union employees processed the applications and supplied most of the manuals. It was the union representative who investigated claimants and who policed employers to insure that payments were made as required. When plaintiff joined Local 200, for instance, it was Johannes who told him that Ball should be paying contributions and who contacted Ball to insure that he began to do so. Again, defendant appears to have done nothing to dispel the appearance of agency, never, for example, having directed union representatives to restrict their activities in advising members about the fund. As a practical matter, plaintiff contends, the only time when it would have become clear that the union representative lacked authority is when a technical question would arise and the representative would refer the matter to the regional office. In plaintiff's case, however, the alleged promise was made without consulting the regional office, and the defendant, by silently accepting the back payments, lent further support to Johannes' apparent agency.

I am satisfied that these allegations create a jury question on the existence of apparent agency. Under Wisconsin law the jury should properly decide whether defendant's manner of administering the fund made it reasonable for plaintiff to believe, and whether plaintiff did in fact believe, that Johannes had the necessary authority. If the jury resolves these questions in plaintiff's favor and also finds that plaintiff in good faith and in the exercise of reasonable prudence relied on this belief in making the payments in question, plaintiff will be entitled to relief.[8]

---

8. I need not determine at this time the proper remedy should plaintiff prevail on the estoppel claim.