**George W. CANN, Plaintiff,**

v.

**CARPENTERS PENSION TRUST FOR SOUTHERN CALIFORNIA, Defendants.**

**No. CV 80–4073–SVW.**

United States District Court, C.D. California.

May 18, 1987.

Ronald Dean, Pacific Palisades, Cal., for plaintiff.

James P. Watson, Cox, Castle & Nicholson, Los Angeles, Cal., for defendants.

## OPINION AND ORDER

WILSON, District Judge.

Plaintiff George Cann seeks a declaratory judgment from this court to the effect that he has not lost, due to a break in service, the 15½ years of pension credits he had accumulated with the defendant pension trust. In the discussion below,[1] the

---

**1.** This Opinion and Order, issued in response to defendant's motion to reconsider, supercedes the court's previous Order of April 18, 1986.

court explains how the holding of *Lee v. Nesbitt*, 453 F.2d 1309 (9th Cir.1972), and the doctrine of equitable estoppel require a finding for the plaintiff.

## A. FACTUAL SUMMARY

By at least December 31, 1964, George Cann had accumulated 15½ years of pension credits in the Carpenters Pension Trust for Southern California ("CPT") (some of the credit was accumulated through a sister trust). At that time, he was 35 years old.

Under the provisions of the CPT pension plan, 15 years of service qualifies a participant for a pension. Pension credits, however, will not vest until one reaches age 45. Furthermore, credits accumulated before reaching age 45 can be lost because of the plan's "break-in-service" rule. Under this rule, a participant must work at least one-quarter year in "covered employment" (employment with unionized employers working within the jurisdiction of management-labor pension trusts covering unionized carpentry employees) within a consecutive three year period or else forfeit all earned credit. The plan contains certain exceptions to the break-in-service rule.[2] For example, an employee could receive a "grace period" that would suspend operation of the break-in-service rule for up to three consecutive calendar years if he was unable to earn pension credit due to involuntary unemployment.[3] An employee could also obtain a grace period while employed as a supervisor for an individual employer[4] or while self-employed in an industry other than the building and construction industry.[5]

The events surrounding the alleged break in service in this case are as follows. After December 31, 1964, Cann earned no credited service in the CPT. From that date until 1968, Cann made efforts to find covered employment, but was unsuccessful. After 1968, Cann no longer signed in at the union hall in an effort to get covered employment.

Between 1965 and 1967, Cann became concerned that he might lose his pension credits because of a break in service. The record of correspondence between him and the CPT shows that he tried to obtain a grace period for several reasons including involuntary unemployment, but that the CPT never adequately responded to his assertion that he was involuntarily unemployed.

Cann first wrote to the CPT on May 14, 1966 asking that his "Trust Fund" be "frozen" for an indefinite period because of lack of work. *See* Plaintiff's Exhibit 3 (note that Cann did not ask for a "grace period" or mention any of the grounds entitling one to a grace period which were described above). In response to Cann's request, the CPT wrote back and merely told Cann that in order to save his credits, he had to earn at least 1 quarter of credits within 3 consecutive calender years until his credits vested. This letter did not respond to the "freeze" request. *See* Plaintiff's Exhibit 4.

On September 26, 1966, Cann wrote back to the CPT and told the trustees that he felt entitled to a "Section 6 and 7," and he referred to himself as self employed, as a supervisor, and as unable to obtain construction work. *See* Plaintiff's Exhibit 9. The reference to "Sections 6 and 7" alludes to those parts of the 1964 Plan that dealt with the break in service rule and vesting. The court believes that Cann was arguing by this September 26, 1966 letter that he qualified for a grace period under the three categories mentioned above. The CPT responded to this request on October 11, 1966 by sending Cann a form to apply for the supervisory grace period. *See* Plaintiff's

---

**2.** *See* Defendant's Exhibit 63, at 22 (article IV, section 6 of the September 1, 1964 version of the CPT pension plan) (hereinafter cited as the "1964 Plan").

**3.** *See* 1964 Plan, article IV, section 6(b). As the court explains below, the three-year limitation for grace periods due to involuntary unemploy-

ment is inconsistent with the Ninth Circuit's holding in *Lee v. Nesbitt*, 453 F.2d 1309 (9th Cir.1972).

**4.** *See* 1964 Plan, article IV, section 6(c).

**5.** *See* 1964 Plan, article IV, section 6(d).

Exhibit 22. Cann filled out this application and returned it. *See* Defendant's Exhibit 5. The CPT reviewed the application in December 1966 and denied it, noting that he did not qualify for a supervisory grace period because he had not worked for an individual employer. The CPT suggested that Cann could obtain a grace period if Cann was an owner or officer of a corporation, worked with the tools of the trade, was paid by that corporation, and made contributions upon himself. *See* Plaintiff's Exhibit 14.

Cann did not incorporate, but he did not give up trying to save his credits. On May 12, 1967, Cann wrote to the CPT asking for a grace period due to involuntary unemployment. *See* Plaintiff's Exhibit 7. This time, Cann specifically mentioned the applicable section number and the ground. The CPT considered this request and denied it, although they did not specifically address the question of whether Cann was involuntarily unemployed. *See* Plaintiff's Exhibit 8. The CPT communicated this denial to Cann in a letter dated June 19, 1967. *See* Plaintiff's Exhibit 15.

Cann next heard from the CPT on October 24, 1968 when it informed Cann that he had lost his credits due to a break in service lasting three years. See Plaintiff's Exhibit 16. The record of correspondence thus shows that the CPT never adequately addressed the question of Cann's involuntary unemployment before it terminated his credits.

In 1980, Cann began an effort to obtain a pension from the CPT. In July 1980, Cann appeared before the Pension Appeals Committee of the CPT to challenge the rule that required pension plan participants to have attained the age of 45 in order for their pension credits to vest. This appeal was denied. Cann then brought this declaratory relief action in federal court. In November 1983, Cann again appeared before the Pension Appeals Committee to pro-

test application of the break-in-service rule in his case. As a result of that hearing, the CPT awarded Cann a grace period due to involuntary unemployment from January 1, 1965 through December 31, 1968. In November 1985, Cann appeared yet again before the Pension Appeals Committee to ask for a grace period due to involuntary unemployment from 1969 to 1972. The Committee denied this request for two reasons. First, it was unpersuaded that Cann was a victim of involuntary unemployment during that period. Second, it felt that he had been given the maximum period provided by the CPT Pension Plan.

### B. THE PLAINTIFF'S THEORY OF RECOVERY

Cann believes he is entitled to a pension from the CPT despite the CPT's break-in-service rule. He notes that by the end of 1964, he had earned 15½ years of pension credits, enough to qualify him for a pension. At that time, however, he was only 35 years old, and his credits would not vest until September 21, 1974, when he became 45 years old. He admits that he obtained no covered employment from 1965 through 1974, but he argues that he should be spared from the workings of the break-in-service rule for two reasons. First he notes that he has proven to the CPT that he was involuntarily unemployed from January 1, 1965 to December 31, 1968. As for the remaining six year period, he argues that he would have been willing to do whatever he had to do to obtain covered employment. He blames the CPT for his failure to find covered employment during that period because the CPT told him in 1968 that his credits had been cancelled. (In fact, his credits should not been cancelled.)[6] In reliance upon the CPT's representation that his credits had been cancelled, Cann made no efforts after 1968 to find covered employment. He argues that had he been properly informed about his

**6.** As set forth in the statement of facts above, the CPT wrote to Cann in 1968 and told him that his credits had been cancelled because of a three year break in service. While it is true that Cann did not work in covered employment during the three years prior to 1968, it is also true,

as the CPT recognized in 1983, that he was involuntarily unemployed during that period. Had the CPT properly recognized Cann's status in 1968, it would not have told him that he had lost his credits at that time.

true status in 1968, he would have made efforts to find covered employment. If he had found such employment, Cann says, he would have worked. If not, he would have been entitled to a grace period due to involuntary unemployment.

The CPT responds that Cann cannot succeed with this argument for two reasons. First, it argues that giving Cann a pension here would in effect be giving him a ten-year grace period for involuntary unemployment when the plan rules provide that no grace period can be longer than three years. Second, it notes that Cann's theory is based on the assumption that his detrimental reliance on the CPT's representations would allow this court to estop the CPT from finding that he was voluntarily unemployed after 1968. The CPT argues, however, that the doctrine of equitable estoppel cannot be used by the court when reviewing the decisions of pension trustees.

The court rejects these arguments by the CPT. First, the court finds that the CPT cannot limit the effect of a grace period for involuntary unemployment for three years. Second, the court finds that the doctrine of equitable estoppel is available to it to review the decisions of pension trustees.

## C. THE BREAK–IN–SERVICE RULE

The CPT argues that it could not have given Cann a grace period for involuntary unemployment from 1969 to 1974 or even to 1971 because such grace periods can only be for a maximum of three years under the plan rules. *See* 1964 Plan, article IV, section 6(b). If the CPT granted Cann's request, the grace period would be almost ten years, or at least seven years.[7]

■ The CPT cannot limit the grace period for involuntary unemployment to three years because it would violate the teaching of *Lee v. Nesbitt*, 453 F.2d 1309 (9th Cir. 1972). That case involved a seaman, Handee Lee, who had earned 16¼ years of pension credits by 1955, when he was 48

years old. To be eligible for a pension, Lee needed 15 years of credits, and he had to be 60 years of age. When he turned 60, Lee applied for a pension, but the pension was denied because he had suffered a break in service during the period from 1955–57. (The plan's rules required that Lee work a total of 200 days within any three year period, and Lee had only worked 187 days from 1955 to 1957). Lee argued that it was unfair to apply the break-in-service rule to him because he had earned enough credits to qualify for his pension prior to 1955 and because the reason he had not found work from 1955 to 1957 was involuntary unemployment. The Ninth Circuit agreed. It noted that a rule that deprived an employee of benefits "solely because of an involuntary interruption in employment after the completion of his minimum employment requirement and before reaching retirement age, is unreasonable on its face." *Id.* at 1312. Thus, the court there held that:

> In sum, we conclude that the rule is unreasonable and hence invalid to the extent that it requires forfeiture of employment credits in the case of an employee who has accumulated the minimum number of credits to entitle him to a pension and then, due to unavailability of covered employment, suffers a break in employment during the interval remaining before his retirement.

*See also Walker Construction Laborers Pension Trust Fund*, 6 Employee Benefits Cas. (BNA) 1412 (C.D. Cal.1984) ("It is unreasonable to apply a break-in-service rule to cancel accumulated service credits when an employee is involuntarily absent due to a disability.").

In Cann's case, the court finds that the CPT's rule that grace periods for involuntary unemployment can only have a length of three years is inconsistent with *Lee* and *Walker* and therefore unreasonable on its face. The CPT's rule still punishes employees for events beyond their control and

---

7. Cann argues that he only needs to have a grace period until December 31, 1971. If he did not work from date until his 45th birthday on September 21, 1974, the total period of unemployment would have been for 2.75 years.

Since a break in service only occurs if one does not work at least one quarter within a three-year period, this 2.75 year period of unemployment would not have produced a break in service.

does not further the CPT's interest in weeding out transient employees or those employees who have no loyalty to the industry. The CPT can allow for unlimited grace periods due to involuntary unemployment and still use the break-in-service rule to achieve its purposes.

## D. ESTOPPEL

Having decided that the break-in-service rule can apply in this case for a term beyond the period from 1965 through 1968, the court turns to Cann's estoppel argument. Cann argues that the CPT should be estopped from asserting that Cann did not engage in covered employment from 1969–on because the CPT's misconduct caused Cann not to seek covered employment during that period. He argues that but for the CPT's misrepresentation, he either would have found covered employment or he would have become entitled to an additional grace period for involuntary unemployment. However, before the court decides whether the facts support application of the estoppel doctrine in this case, it must first address the CPT's argument that the court does not have the power to employ equitable estoppel in its review of the CPT's actions in this case.

### 1. THE COURT HAS THE POWER TO INVOKE THE DOCTRINE OF EQUITABLE ESTOPPEL WHEN REVIEWING THE ELIGIBILITY DECISIONS OF TRUSTS

The CPT argues that the court may not invoke the doctrine of equitable estoppel when reviewing the decisions of trusts regarding pension eligibility. The court disagrees.

First, the court notes that the doctrine of equitable estoppel is a weapon in this court's arsenal of inherent equitable powers. *See First National Bank of Portland v. Dudley*, 231 F.2d 396 (9th Cir.1956) ("Equitable estoppel is an age-old principle of equity"). Upon review of the Ninth Circuit cases, the court concludes that although this doctrine has limited applicability in this context, it nevertheless applies in this case.

The Ninth Circuit cases relevant to this issue can be organized into three categories. In the first group of cases, the courts appear to recognize the applicability of estoppel but refuse to apply it because the courts would be compelling a trust to commit an illegal act. A second group of cases also recognize the estoppel doctrine, but in those cases the courts found that the fact patterns would not support application of the doctrine. Finally, in a third group of cases, the courts appear to take a broad view of that estoppel can never be used in reviewing pension plan decisions. Accepting the view of this third group of cases would require this court to ignore most of the Ninth Circuit authority in this area.

The earliest Ninth Circuit found which discussed the applicability of estoppel in a benefit plan context is *Thurber v. Western Conf. of Teamsters Pension Plan*, 542 F.2d 1106 (9th Cir.1976). The *Thurber* court indicated that estoppel was available in this context, but not to compel an illegal act. In that case, the plaintiff Thurber sought early retirement and inquired of his pension fund administrator whether he was eligible. The administrator informed Thurber that he was not eligible because he had suffered a break in service. The administrator added, however, that this break could be healed if Thurber could show that he had worked the required number of hours during the alleged break-in-service period and if supplemental employer contributions were made for that period. Thurber made the required showing, and the supplemental employer contribution was also made. Later, however, after an application by Thurber, the pension plan refused to grant a pension to Thurber because no written agreement existed authorizing the plan to accept such supplemental employer contributions.

Thurber argued that the plan should be estopped from denying him benefits because the administrator had told Thurber that the break in service could be cured with a supplemental employer contribution, because the supplemental contribution had been made in reliance on the administra-

tor's representation, and because the administrator had accepted that contribution.

In its opinion, however, the *Thurber* court pointed out that the statute under which the plan was set up, section 302 of the Labor Management Relations Act, 29 U.S.C. § 186, prohibited the acceptance of supplemental employer contributions like the one made in *Thurber* unless the payments were made pursuant to a written agreement that authorized such payments. Thus the court held that even though Thurber relied upon the acceptance of the payment, estoppel was inapplicable because it would require the plan to commit an illegal act, namely accept an employer contribution that the statute governing the plan said could not be accepted.

The *Thurber* court relied upon a similar case from the Second Circuit in reaching its conclusion. *See Moglia v. Geoghegan*, 403 F.2d 110 (2d Cir.1968), *cert. denied*, 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969). *See also Arizona Laborers v. Conquer Cartage Co.*, 753 F.2d 1512, 1520 n. 13 (9th Cir.1985) (in dicta, the court characterizes *Thurber* as holding that "the doctrine of estoppel may not be invoked to compel an act that would not be in compliance with § 302(c)(5)(B).").

In a second group of cases, the Ninth Circuit also indicated that estoppel is available to a court in reviewing decisions by trustees of collectively bargained benefit plans, but the panels in those cases refused to apply the doctrine because of the factual circumstances in each case. *See Rehmar v. Smith*, 555 F.2d 1362 (9th Cir.1976); *Gordon v. ILWU–PMA Benefit Funds*, 616 F.2d 433 (9th Cir.1980); *Audit Services, Inc. v. Rolfson*, 641 F.2d 757 (9th Cir.1981); *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091 (9th Cir.1985).

*Rehmar* involved a case in which pension trustees denied a benefit to a named beneficiary, Lillian, because she was not a spouse, as required by the plan. The employee in *Rehmar*, Sam, designated Lillian, with whom he had lived for many years, as his beneficiary, and the plan had accepted the designation. When the plan refused to pay her benefits, she argued that it was estopped because the plan had accepted the designation. The court found estoppel inapplicable because Sam had never relied to his detriment on the plan's acceptance of the designation of his beneficiary. "There was no finding or evidence that Sam failed to marry Lillian because of any action of the trustees. There was thus no detrimental reliance, a necessary element of estoppel." *Rehmar*, 555 F.2d at 1369.

*Gordon*, 616 F.2d 433, like *Rehmar*, also indicates that estoppel is available in a case involving a benefit plan created by a collective bargaining agreement. Also like *Rehmar*, the facts of the case did not support an estoppel theory. Under the plan in that case, the employee's wife was entitled to a death benefit when he died, but only if she filed an affidavit. This affidavit requirement was not clear from the rules as published. In that case, however, she died before filing the affidavit, and so the plan refused to pay the death benefit to her estate. The district court awarded the estate the death benefit under an estoppel theory, saying that she may have relied on the "common understanding of the rules as published." *Id.* at 439. The Ninth Circuit reversed, saying that no evidence existed that "she failed to complete the necessary forms because of any actions attributable to the trustees or because she believed that the extended death benefits 'vested' automatically upon her husband's death." *Id.*

For other cases in which the factual posture led the Ninth Circuit to reject an estoppel argument, see *Ellenburg*, 763 F.2d 1091 ("estoppel principles have been applied to pension plans"); *Audit Services*, 641 F.2d 757 (facts do not support estoppel defense by employer in an action to recover contributions).

In contrast to these first two groups of cases is a third group of cases which indicate that estoppel is not available to a court reviewing a pension plan decision. The first of these two cases in this group purports to rely strictly upon *Thurber*, the earliest Ninth Circuit case in this area, but its holding appears to go beyond the scope of *Thurber*. *See Aitken v. IP & GCU–Employer Retirement Fund*, 604 F.2d 1261

(9th Cir.1979). The second case in this group merely picks up on the broad language of *Aitken.* *See Moore v. Provident Life & Accident Ins. Co.,* 786 F.2d 922 (9th Cir.1986).

*Aitken* involved a sole proprietor who nevertheless joined a union and paid in contributions to a benefit plan. When he applied for his benefits, the plan determined that as a sole proprietor, he was ineligible to participate in the fund. The plaintiff raised an estoppel argument based on all of the money he paid in, but the *Aitken* court rejected this argument because, it said, *Thurber* held that the "federal law of estoppel may not be applied to compel a § 302 retirement pension fund to pay benefits to someone determined to be ineligible under the provisions of the plan agreement." *Thurber,* however, did not precisely so hold. Rather, *Thurber* held that estoppel could not be used to compel an illegal act. Nevertheless, on the basis of this restated holding, the *Aitken* court rejected the estoppel theory.

This restatement of the *Thurber* holding remained dormant for six years until revived by the Ninth Circuit in *Moore.* In that case, involving a collectively-bargained employee benefit plan, the plan denied medical benefits to an ex-employee who had been injured in a motorcycle accident. To qualify for benefits under the plan in that case, the employee had to work at least 80 hours per month for at least 3 months. An employee's eligibility ended the first day of the second calender month following the month in which the employee worked less than 80 hours. The employee could, however, retain his medical benefits for another six months if he continued making contributions to the plan. In this case, the employee had stopped working 22 months before his accident, but contributions on his behalf had continued the entire time. On the basis of the acceptance of these contributions, Moore argued that the fund was estopped from denying him benefits. The court gave short shrift to this estoppel theory, denying it merely by citing *Aitken* and saying "[a]n employee benefit fund created under a collective bargaining agreement cannot be required on the grounds of equitable estoppel to pay benefits to a person ineligible under the Plan's provisions."

The CPT points to the language quoted above from *Aitken* and *Moore* and argues that under those cases, if the CPT determines that someone is ineligible under the plan's provision, then estoppel cannot be applied to require the CPT to pay that person benefits. The quoted language from *Aitken* will support such an interpretation. The language says that estoppel is unavailable to require a trust fund to pay benefits "to someone *determined* to be ineligible under the provisions of the plan agreement." *Aitken,* 604 F.2d at 1266 (emphasis added). Because of the passive construction in the quoted clause, it is unclear *who* makes the eligibility determination. If it is the trustees who make this "determination," then the defendant may be correctly interpreting *Aitken* because a rephrasing of the quoted language would be: "if the trustees determine that a claimant is ineligible under the plan, then estoppel cannot be used to award the claimant benefits."

Nevertheless, the court does not accept the CPT's interpretation of *Aitken* as the definitive statement from the Ninth Circuit on the law of estoppel in this area. Under such an interpretation, estoppel would never be available in these cases. Therefore, such an interpretation contradicts *Thurber,* which only held that estoppel cannot be used to compel an illegal act. To the extent, then, that *Aitken* contradicts *Thurber,* the court must rely on *Thurber* itself. First, the court notes that the *Aitken* court specifically relied on *Thurber* in coming to its decision. *Aitken,* 604 F.2d at 1267 ("The holding of *Thurber* controls our disposition of the estoppel claim here."). This court believes that the *Aitken* panel would have been more forthright if it had intended to state a rule different from that stated in *Thurber.* Second, the court notes the Ninth Circuit opinions in *Rehmar,* 555 F.2d 1362, *Gordon,* 616 F.2d 433, *Audit Services,* 641 F.2d 757, and *Ellenburg,* 763 F.2d 1091 have used language consistent with *Thurber,* and inconsistent with the CPT's

interpretation of *Aitken.* Finally, to the extent *Thurber* and *Aitken* are inconsistent, this court feels obligated to follow the earlier case. *See United States v. Mount,* 438 F.2d 1072, 1074 (9th Cir.1971) (an opinion, not having been decided by a panel sitting en banc, cannot overrule a previous opinion from another panel in the same circuit).

■ In conclusion, then, this court finds that estoppel is available for use in this case as long as it is not used to compel an illegal act. The court believes that if the Ninth Circuit had intended to prohibit a district court from exercising one of its inherent equitable powers when reviewing a decision of pension trustees, the Ninth Circuit would have done so explicitly.

The CPT raises another argument which the court must now address. It argues that if the court finds in this case that application of estoppel is appropriate, then it should remand this case back to the trustees so that they can decide whether the doctrine should be applied. The CPT bases this argument on *Rehmar v. Smith,* 555 F.2d 1362 (9th Cir.1976). *Rehmar,* it says, requires the court to review the decisions of trustees on an arbitrary and capricious standard. Thus, it argues, the trustees should weigh application of the estoppel doctrine, and the court should decide if the trustees were arbitrary and capricious not to use the doctrine.

■ The court rejects this argument by the CPT because as stated above, the equitable estoppel doctrine is a principle of equity, and the court may use this doctrine in the exercise of its equitable power. Thus, the doctrine is a tool of this court to be used, if necessary, in this instance. (Whether the trustees may also use the estoppel doctrine is an issue the court need not address at this time). Another district court has agreed with this court's view that the estoppel question is one for the court and not for the trust. *See Scheuer v. Central States Pension Fund,* 358 F.Supp.

1332 (E.D.Wis.1973), *on rehearing,* 394 F.Supp. 193 (E.D.Wis.1975), *aff'd without opinion,* 570 F.2d 347 (7th Cir.1977).

> Plaintiff is entitled to an independent evaluation of his estoppel claim despite the trustees' decision to refuse benefits. Whatever deference is owed the trustees in making general policy decisions or interpreting the agreement, it would be incongruous for them to decide finally whether their own actions have, as an equitable manner, estopped them from refusing benefits. Courts have recognized that the employees' reasonable expectations of receiving the promised reward must be protected even though the agreement puts the administration of the fund in the absolute discretion of the trustees.

*Id.* 358 F.Supp. at 1338–39 n. 5.

Finally, the court notes that having the court, and not the trustees, decide the equitable estoppel issue is consistent with the literal language in *Rehmar* concerning the appropriate standard of review of pension trustee decisions. *Rehmar* made clear that these decisions "may be reversed only where they are arbitrary, capricious or *made in bad faith,* not supported by substantial evidence, or erroneous on a question of law." 555 F.2d at 1371. The *Rehmar* court later added: "We find this standard of judicial review, which leads neither to abdication of traditional judicial control of fiduciaries nor to excessive judicial intervention in trust operations, in harmony with federal labor policy." *Id.* This court believes that to send the estoppel question itself back to the trustees would be an abdication of its duty of judicial review.

### 2. THE FACTS OF THIS CASE SUPPORT APPLICATION OF THE DOCTRINE OF EQUITABLE ESTOPPEL

According to the Ninth Circuit, the court may find estoppel appropriate under the following test: "(1) the party to be estopped must know [8] the facts; (2) he must

---

**8.** The doctrine of estoppel does not require actual knowledge on the CPT's part. Rather, "at least the circumstances must be such that knowledge of them is necessarily imputed to the party to be estopped." *United States v. Georgia-Pacific Co.,* 421 F.2d 92, 96 n. 4 (9th Cir.1970) (quoting 3 Pomeroy, *Equity Jurisprudence* § 805, at 191–92 (5th ed. Symons 1941)).

intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." *See Ellenburg v. Brockway, Inc.,* 763 F.2d 1091, 1096 (9th Cir.1985).

█ Turning to the first element of the test, Mr. Cann alleges that the "facts" known by the CPT back in 1968 were that Mr. Cann was indeed eligible for a grace period because of involuntary unemployment from 1965 through 1968. The point of Mr. Cann's argument is that the CPT not only kept this "fact" from him, but indeed led him to believe the exact opposite. The first task for the court then, is to consider whether it should impute knowledge of these facts to the CPT in 1968 given the underlying circumstances. (The court cannot say, based on this record, that the CPT had "actual knowledge" of Mr. Cann's entitlement to a grace period).

Having reviewed the circumstances, the court does impute the requisite knowledge regarding Mr. Cann's eligibility for a grace period from 1965 through 1968 to the CPT. During that period, Mr. Cann informed the CPT at least three times about his difficulty in finding covered employment. See Plaintiff's Exhibits 3, 7, and 9. On May 12, 1967, Mr. Cann specifically asked the CPT for a grace period based on involuntary unemployment, and even cited to the proper section in the plan book. See Plaintiff's Exhibit 7. Thus, during this period, the CPT was on notice regarding the type of grace period sought by Mr. Cann and his reasons for his entitlement to this exception. At the time, however, the CPT did not even appropriately respond to the point raised by Mr. Cann regarding involuntary unemployment. Instead of addressing the merits of whether Mr. Cann was actually involuntarily unemployed during this period, the CPT wrote back to Cann denying his request because Cann was "not self-employed in an industry other than the building and construction industry." Plaintiff's Exhibit 15. This response is a non sequitur. It would be a relevant response to a grace period based on Article IV, section 6(d) of the Plan Book (Exception on Account of Self-Employment in an Industry Other Than the Building and Construction Industry), but it is not a relevant response to Mr. Cann's request for a grace period under Article IV, section 6(b) (Exception on Account of Disability or Unemployment). When the CPT finally addressed Cann's request appropriately in November 1983, it agreed with Cann and awarded him a grace period from 1965 through 1968. Thus the court concludes that had the CPT properly carried out its fiduciary duty back in 1967 and 1968, it would have known that Cann was eligible for the grace period. Therefore, the court imputes knowledge by the CPT back in 1968 of Mr. Cann's eligibility for the grace period due to involuntary unemployment.

Since the first element for estoppel has been met, the court turns to these second element of the test: did the CPT intend that its conduct be acted upon by Cann or did the CPT act in a manner that would have led Cann to believe that the CPT had this intent? The relevant "conduct" here was the letter sent by the CPT to Cann in October 1968 informing him that he had lost his pension credits because of a break in service. The CPT may not have had any "intent" by sending this letter, but Cann had the right to believe upon receiving that letter that the CPT intended to convince Cann that he had lost his credits and to believe that he need do nothing more to save those credits. Thus, the CPT fulfilled this second requirement by sending the 1968 letter.

The third requirement for estoppel is also fulfilled in this case. Cann was ignorant of the "true facts." When Cann received the October 1968 letter, he did not know that he was entitled to a grace period from 1965 through 1968. Indeed, he was being told the exact opposite by his fiduciaries, the trustees. He was certainly entitled to believe their representations. Cann had asked the CPT if he was entitled to a grace period, and it had indicated that he was not so entitled.

Finally, because Cann relied upon the CPT's conduct to his detriment, the fourth requirement for estoppel is satisfied. When Cann received the October 1968 letter, Cann believed that he was not entitled to a grace period and that he had lost his credits. He therefore made no further efforts to find covered employment or to save his credits. The court finds that had the CPT not misled Cann about the status of his pension credits in 1968, Cann would have continued to make efforts from 1969 to 1971 to obtain covered employment. These efforts would have either resulted in his finding a job or in the CPT extending his grace period for involuntary unemployment. The blame for his failure to make these efforts can be laid at the doorstep of the CPT.

Therefore, the court holds that the CPT is estopped from asserting that Cann was involuntarily unemployed from 1969 to 1971.

The CPT argues that even though the above-mentioned facts indicate that estoppel might be appropriate in this case, the court should examine other facts which show that applying the estoppel doctrine against the CPT in this case would not be fair. The court disagrees.

First, the CPT points out that prior to 1968, it did inform Cann of a way in which he could save his pension credits. In December 1966, the CPT told Cann that if he was an owner or officer of a corporation, worked with the tools of the trade, and he was paid by the corporation, he could make contributions upon himself. *See* Plaintiff's Exhibit 14. Thus, the CPT argues that it gave Cann good advice on how he could save his pension credits.

This 1966 letter does not have much value however. First, the evidence indicates incorporation would not have made much economic sense to Cann at that time. *See* Plaintiff's Exhibit 20 (a recent letter from Cann's accountant indicating that the accountant would have advised against incorporation back in 1966). Second, the CPT has impliedly found that incorporation in 1966 would not have enabled Cann to save his credits. When the CPT acted in 1983 to award Cann a grace period from 1965 through 1968, it knew that one of the options that Cann had during that period was incorporation. Nevertheless, the CPT still found that Cann was involuntarily unemployed from 1965 through 1968. If Cann could have incorporated during that period in order to save his credits, then some "covered employment" would have been available to him. Thus the implication of the CPT's finding of involuntary unemployment from 1965 through 1968 is that incorporation during that period was not a viable option to Cann.

The CPT has a second argument for why estoppel would be unfair in this case. It notes that Cann could have assuaged the detrimental impact of the CPT's 1968 letter if he had appealed the termination of his credits at that time. Why, the CPT argues, should Cann now be rewarded for his lack of diligence back in 1968. Cann simply complained a decade too late.

While this argument has some appeal, the court ultimately rejects it because the CPT never notified Cann back in 1968 that he was entitled to an administrative review of the cancellation of his credits. First, the court notes that Mr. Cann was not represented by a lawyer at the time he was notified that his credits were cancelled. Second, an examination of the 1968 letter from the CPT to Cann that told him that his credits had been cancelled shows that the letter does not give Cann notice of his ability to appeal the termination. *See* Plaintiff's Exhibit 16. The letter does refer Cann to the Pension Plan Book. At the time of the letter, the Plan Book did not have a provision informing participants like Cann of their rights to appeal a negative determination. *See* Plaintiff's Exhibit 63. In contrast, the Restated Plan Book, published around 1976 does contain Article VIII, which provides detailed information on the procedure for appeals. Had the 1968 Plan Book contained these provisions, the court's decision in this case might have been different.

In conclusion, because of the CPT's wrongful conduct in 1968, the CPT is now estopped from asserting that Cann was vol-

untarily unemployed from 1969 through 1974. If the CPT were to deny Cann his pension at this point, it would be violating the holding of *Lee v. Nesbitt*. Therefore, the court remands this case back to the CPT and instructs the CPT to award Mr. Cann his pension.

IT IS SO ORDERED.